Filed 2/15/23  McKenna v. Sony Pictures Entertainment CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| PAULE McKENNA, | B304256, B310814 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19SMCV01329) |
| v. | |
| SONY PICTURES ENTERTAINMENT, INC. et al, | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Harry Jay Ford, III, Judge.  Affirmed in part and dismissed in part.

Paule McKenna, in pro. per., for Plaintiff and Appellant.

Ballard Spahr, Louis P. Petrich, and Elizabeth L. Schilken for Defendants and Respondents.

Plaintiff and appellant Paule McKenna (plaintiff), the executor of the estate of Christopher Jones, sued defendants and respondents Sony Pictures Entertainment, Inc., Boss Film Productions, Inc., and Visiona Romantica, Inc. (collectively defendants) for allegedly misusing Jones's name and likeness (posthumously) in the film *Once Upon a Time . . . in Hollywood*. Defendants filed a special motion to strike the complaint pursuant to the anti-SLAPP statute (Code Civ. Proc.,[1] § 425.16). The trial court granted the motion in its entirety and, in later proceedings, granted defendants' motion for attorney fees.[2] We are asked to decide whether the challenged causes of action arise from protected activity and, if so, whether plaintiff satisfied her burden to show a probability of success on the merits of her claims. We also consider whether plaintiff timely appealed the order awarding defendants attorney fees.

## I. BACKGROUND

### A. *Jones and the Film*[3]

Christopher Jones was a popular actor in the 1960s. He starred in the television series *The Legend of Jesse James* and a

---

[1]     Undesignated statutory references that follow are to the Code of Civil Procedure.

[2]     On May 21, 2021, plaintiff's separate appeals (B304256 and B310814) were consolidated for briefing, argument, and decision.

[3]     The summary that follows is derived from the allegations in the operative pleadings and, to some degree, the parties' evidence submitted in connection with the special motion to strike (§ 425.16, subd. (b)(2)), including the copy of the film lodged with the court.

number of movies including *3 in the Attic* and *Wild in the Streets*. Jones quit Hollywood in 1969.  He died in 2014.

*Once Upon a Time . . . in Hollywood* (the film), is a film written and directed by Quentin Tarantino.  It was produced by Boss Film Productions and released by Sony Pictures Entertainment in 2019.  The film stars Leonardo DiCaprio as fictional actor Rick Dalton, Brad Pitt as his fictional stunt-double Cliff Booth, and Margot Robbie as real-life actor Sharon Tate.  It depicts a few days in the lives of the three main characters in February and August 1969, and imagines (or reimagines, in Tate's case), how their lives intersect with the Charles Manson family.[4]

A variety of products with recognizable name brands appear throughout the course of the film.  For example, there is a scene in which Pitt's character Booth cooks a box of Kraft macaroni and cheese.  A box of Wheaties cereal is on his counter while he does so, and a copy of TV Guide is seen elsewhere in his home.  The same scene includes brief glimpses of Booth's television, which at one point plays an advertisement for Jones's movie *3 in the Attic* and identifies Jones as one of its stars.  In various other scenes, Booth wears a t-shirt with a logo for Champion spark plugs on it.  Characters also at one point drive down Hollywood Boulevard and pass the Pantages Theatre, which was displaying a marquee for *3 in the Attic* featuring Jones's name.

---

[4]     While the film provides her with a happier ending, in reality Sharon Tate was murdered by members of the Manson family.

*B.     The Complaint*

In July 2019, plaintiff filed a complaint alleging five causes of action against defendants: (1) commercial misappropriation of publicity rights in violation of Civil Code section 3344.1, subdivision (a); (2) commercial misappropriation based on common law publicity rights; (3) trademark infringement in violation of the federal Lanham Act; (4) unfair business practices under Business and Professions Code section 17200 (the UCL); and (5) negligence.

Though the complaint is not a model of clarity, it can be read to allege the Dalton and Booth characters were modeled and styled after Jones and, taken together, constitute an unauthorized use of Jones's likeness that was used to endorse brand name products depicted in the film.  It also alleges defendants used Jones's likeness, identity, persona, publicity rights, trademark, trade dress, photograph, name, and film clip for commercial use in advertisements to market and promote the film.  The complaint further asserts defendants' use of Jones's likeness in connection with brand endorsements could mislead consumers into thinking the products shown in the film were endorsed by Jones (or his estate) because the likeness is so carefully and unnecessarily crafted to take advantage of the popularity and authenticity of Jones.  The complaint specifically alleges Jones's likeness was used to endorse brands including Tabasco, Twinkies, Wheaties, Carnation, Champion, and Lion.

Factually, the complaint alleges Jones's name is mentioned twice during the film and a marquee with his name is depicted in the background of a set.  It emphasizes that Tarantino, during a podcast interview, mentioned Jones as one of dozens of actors

4

used as inspiration for the film.[5]  The complaint also avers a hairstylist who worked on the film said Tarantino instructed her to copy Jones's hairstyle.

The complaint goes on to allege various aspects of Jones's life mirror aspects of the characters in the film.  For example, the complaint alleges Jones had roles as a spy, a soldier, and in a musical with Virna Lisi; it also alleges he was filmed shirtless for one of his movies.  In comparison, the complaint alleges Dalton is portrayed shirtless on a roof and his movie credits in the film include portraying a solider, portraying a spy, and acting in a musical.  As another example, the complaint alleges Jones often wore cowboy boots, wore a gold pendant necklace, spent some time with Tate while filming in Rome, and had a flashy agent, and that these elements are also present in the film as to Dalton or Booth (or both).

The complaint seeks damages, as well as a permanent injunction prohibiting defendants from using Jones's name, photographs, likeness, images, voice, sound-alike voice, signature, identity and persona, trademark, and trade dress until Jones's influence on the film is credited.

---

[5]  The complaint attached a document it describes as a transcript of that interview.  According to this transcript, Tarantino described Dalton as a "he-man" leading man, stating he was a bit like a number of actors, including George Maharis, Edd Byrnes, Tab Hunter, Fabian, Vince Edwards, and Ty Hardin.  He contrasted Dalton with the new leading man of the age, who was long haired and more androgynous, naming Michael Sarrazin, Christopher Tabori, Peter Fonda, Michael Douglas, Christopher Jones, Arlo Guthrie, and Robert Walker Jr. as examples.

*C.*    *The Anti-SLAPP Motion*
*1.*    *The motion*

In October 2019, defendants filed a special motion to strike the complaint under section 425.16 (an anti-SLAPP motion). Defendants contended the film is a statement made in a public forum and conduct in furtherance of the exercise of free speech. They further contended the film concerns issues of public interest because it concerns the Manson family murders, the culture of the 1960s, and the movie and television industry. Defendants further argued plaintiff could not demonstrate a probability of prevailing on the merits on any of her causes of action.

Defendants submitted declarations in support of their motion. The declaration of Shannon McIntosh, a producer on the film, avers: the film is set in the late 1960s, so the characters are occasionally depicted using consumer products that were popular at the time; there was one paid product placement arrangement related to a product depicted in the film, Hennessey cognac, but none of the uses of Hennessy in the film are connected to any use of Jones's name or alleged use of his likeness; the remaining products used in the film were used because Tarantino wanted to capture the look and feel of the time period; and the products and logos were depicted for artistic reasons with no money being paid to the filmmakers to include them in the film.

Another declaration submitted by defendants cataloged the three instances in which Jones's name appeared in advertisements or promotions for the film: (1) a mock magazine devoted to the semi-fictional world depicted in the film that mentions both the fictional characters Dalton and Booth and various real-life entertainers including Jones, Steve McQueen, Clint Eastwood, Michael Douglas, and Frank Sinatra, among

6

others; (2) a promotional trailer, which ran in AMC theaters from July 21 to 26, 2019, describing the transformation of several blocks of Hollywood Boulevard during filming and briefly featuring a mock marquee on the Pantages Theater for Jones's film *3 in the Attic*; and (3) a promotional trailer depicting the same content that ran on Comedy Central on or about July 26, 2019.[6] This declaration also maintained defendants did not sell any items of merchandise in connection with the film and those items that had been distributed for free did not make use of Jones's name or likeness.

Defendants also submitted more than half a dozen reviews or articles about the film from publications including the Los Angeles Times, The New York Times, and The New Yorker. One review noted "[t]he film revels in the detritus of the era . . . there's the cupboards stocked with Velveeta, Hi-C, Nestle's Quik and Wonder Bread, oil cans of beer, with copies of Mad Magazine and TV Guide strewn on everyone's coffee tables, and one scene in which the camera lovingly records [Booth] mixing himself up a box of Kraft Mac and Cheese and eating it out of the pan with a wooden spoon. (Marchant, *Class act of '69: 'Once Upon a Time . . . in Hollywood' is Tarantino's homage to his Southern California youth*, Arkansas Democrat Gazette (July 26, 2019) <https://www.arkansasonline.com/news/2019/jul/26/class-act-of-69-20190726/> [as of Feb. 7, 2023].) Another review describes the film as being "set in a stunningly evoked Hollywood past." (Ide, *Once Upon a Time in Hollywood review – uneven ode*

---

[6]     A supplemental declaration later explained one of the featurettes on the home video release included a marquee with Jones' name, which appeared for about one second.

*to a lost era*, The Guardian (August 18, 2019) <https://www.theguardian.com/film/2019/aug/18/once-upon-a-time-in-hollywood-review-quentin-tarantino-leonardo-dicaprio-brad-pitt> [as of Feb. 7, 2023].)  A third describes Tarantino as "[f]orging a style from the scraps of a consuming culture" and notes he "may be on a mission to get everything right about 1969, down to the sounds and smells . . . ."  (Lane, *Quentin Tarantino Tweaks History in "Once Upon a Time . . . in Hollywood,"* The New Yorker (July 26, 2019) <https://www.newyorker.com/magazine/2019/08/05/quentin-tarantino-tweaks-history-in-once-upon-a-time-in-hollywood> [as of Feb. 7, 2023].)

### 2.      *The opposition*

Plaintiff opposed the anti-SLAPP motion and submitted various exhibits in support of her opposition.  Among them was a copy of an interview with the lead hairstylist on the film who said Pitt's look during the film was patterned off of Jones's appearance.  Plaintiff also submitted a number of declarations from relatives and friends stating Jones's likeness is depicted in the film.  Many of the declarations also opined the inclusion of brand logos either involved payment or linked Jones to those products.  For example, one declaration asserted the film is "all about" Jones, and stated both Booth and Dalton resembled Jones at different points in his life.

Plaintiff also submitted other materials with her opposition including: photographs and photo compilations comparing Jones's appearance to the appearance of Pitt and DiCaprio in the movie; printouts of third-party websites advertising merchandise related to the film; articles identifying brand endorsement and product

8

placement deals involving other movies; and portions of articles stating the new owner of the Playboy mansion, where a scene in the film was shot, was an associate producer on the film.

### 3. *The trial court's decision*

After hearing argument, the trial court granted defendants' special motion to strike and struck the complaint in its entirety. The court found plaintiff's causes of action arose from protected conduct under section 425.16, subdivision (e)(3) or (e)(4) because movies are protected free speech and defendants established overwhelming public interest in the film.[7] The trial court also found plaintiff failed to establish a probability of prevailing on the merits on any of her causes of action.

### D. *Attorney Fee Proceedings*
### 1. *The fee motion*

In April 2020, defendants filed a motion for attorney fees. The motion argued defendants were entitled to a mandatory fee award in the amount of $64,350.50 because they were the prevailing parties in an action under Civil Code section 3344.1,

---

[7]  Section 425.16, subdivision (e) provides in relevant part: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes . . . (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

subdivision (a), and because they were the prevailing defendant on their anti-SLAPP motion.[8]  The motion was served on plaintiff, in pro per, the same day it was filed.  The hearing on the fee motion was later rescheduled from August 2020 to December 2020.

Plaintiff opposed the motion arguing it should be denied because it had not been timely served on her then-attorney of record[9] and because it incorrectly included defendants' entire defense fee for the case.  Plaintiff objected to the amount of fees defendants' counsel incurred in performing certain identified tasks, including watching the film, watching Jones's movie *3 in the Attic*, researching Jones, reviewing bonus material included on the home video release of the film, drafting declarations, and drafting the anti-SLAPP motion.

The trial court granted the attorney fees motion.[10]  The court found the motion was timely served on plaintiff in pro per.

---

[8]     The motion represented $48,326.50 was incurred in connection with the anti-SLAPP motion and $9,427.50 was incurred in connection with the fee motion.

[9]     At the time the motion was served, plaintiff was represented by counsel in connection with her appeal of the order granting the anti-SLAPP motion.  That attorney was not then representing her in connection with the fee motion, though the attorney later briefly assumed that role before withdrawing from the case altogether.

[10]     The record on appeal does not contain a reporter's transcript of the hearing on the fee motion.  Plaintiff did, however, seek and obtain a settled statement regarding the hearing.

It found defendants prevailed on their anti-SLAPP motion and were entitled to mandatory fees and costs incurred in connection with the motion under section 425.16, subdivision (c).  The court further found that pursuant to Civil Code section 3344.1, subdivision (a), defendants were the prevailing party and entitled to all fees and costs incurred to litigate the action.  The court stated plaintiff did not argue the fees and costs should be apportioned and, in any event, apportionment would be impracticable.  The court concluded the requested fees, in the amount of $64,350.50, were reasonable.

Defendants filed and served a notice of entry of the order granting the attorney fee motion on December 11, 2020.

### 2.    *The fee appeal*

Plaintiff initiated the filing of a notice of appeal at 11:49 p.m. on February 9, 2021.  Her "final portal entry" was at 11:52 p.m.  The notice of appeal was file-stamped at 12:00 a.m. on February 10, 2021.  (February 10, 2021, was 61 days after the notice of the court's attorney fees ruling was served.)  The notice of appeal, however, did not specify the judgment or order from which plaintiff was appealing (or the name of the appealing party), and it was later rejected by the clerk's office for that reason.  Plaintiff filed an amended notice of appeal at 11:48 a.m. on February 10, 2021; this one specified she was appealing the attorney fees ruling.

Plaintiff later filed a motion to correct the notice of appeal, asserting the midnight file stamp was due to a transmission failure.  She asked this court to deem the first notice of appeal to have been filed on February 9, 2021, and to apply the initial filing date to the amended notice of appeal that was filed at 11:48 a.m.

11

on February 10, 2021.  Defendants opposed the motion, arguing in pertinent part that plaintiff's submission was late not because of a transmission issue but because she waited until eight minutes prior to midnight to submit the filing.  Defendants also submitted a declaration asserting the e-filing service plaintiff used instructs users to submit documents no later than 11:50 p.m. on the day the filing is due.

## II.  DISCUSSION

We conclude the relevant acts involved in making *Once Upon a Time…in Hollywood*, including decisions to include recognizably branded products, are activity protected by the anti-SLAPP statute.  The film is a creative work that focuses on a time period of interest and reimagines a widely known historical event.  Defendants submitted evidence establishing the decisions to include branded products in the film were creative, not financially motivated.  Plaintiff's allegation to the contrary does not negate defendants' showing that the claims arise out of protected activity.

We also conclude plaintiff did not demonstrate any of her claims have minimal merit.  Her statutory right of publicity claim concerning a creative audiovisual work is defeated as a matter of law by defendants' evidence.  Her Lanham Act and UCL claims fail because defendants' pertinent filmmaking decisions are protected by the First Amendment and because she has not established a protectible trademark or trade dress interest.  Plaintiff's negligence claim cannot be maintained consistent with First Amendment protections.  And her common law right of publicity claim has no likelihood of success because such rights under the common law expire upon the death of the original

12

holder.  As a result, we affirm the trial court's order granting defendants' anti-SLAPP motion.

We dismiss plaintiff's appeal of the attorney fees order as untimely.

### A.    *The Anti-SLAPP Statute*

The anti-SLAPP statute was enacted to curtail lawsuits "brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition . . . ." (§ 425.16, subd. (a).)  "[A] special motion to strike under section 425.16 involves a two-step process.  First, the moving defendant must make a prima facie showing 'that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant]'s right of petition or free speech . . . ."' [Citation.]" (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 420 (*Montebello*).)  If the defendant carries this burden, the plaintiff must then demonstrate its claims have at least "'minimal merit.'" (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384-385 (*Baral*).)  "The procedure is meant to prevent abusive SLAPP suits, while allowing 'claims with the requisite minimal merit [to] proceed.' [Citation.]" (*Montebello, supra*, at 420.)

We review an order granting or denying an anti-SLAPP motion de novo.  (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).)  We consider the parties' pleadings and affidavits describing the facts on which liability or defenses are predicated.  (§ 425.16, subd. (b)(2); see also *San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76, 94.)

13

*B.    The Complaint Arises from Protected Activity*

A party filing an anti-SLAPP motion satisfies the first analytical step if the party makes a prima facie showing the plaintiff's cause of action "aris[es] from" an act the defendant performed in furtherance of the defendant's right of petition or free speech.  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78; accord, *Park*, *supra*, 2 Cal.5th at 1062 ["A claim arises from protected activity when that activity underlies or forms the basis for the claim"].)  "[I]n ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability."  (*Park*, *supra*, at 1063; accord, *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1010, 1015 [anti-SLAPP analysis begins with a consideration of the elements of each claim, "the actions alleged to establish those elements, and whether those actions are protected"].)  Whether a claim is based on protected activity turns on "whether the "'core injury-producing conduct'" warranting relief under the cause of action is protected activity."  (*Mission Beverage Co. v. Pabst Brewing Co., LLC* (2017) 15 Cal.App.5th 686, 698.)

There are four categories of protected activity under the anti-SLAPP statute.  The categories defendants invoke in this case are the subdivision (e)(3) and (e)(4) categories we earlier quoted in the margin: statements in a public forum in connection with an issue of public interest and conduct in furtherance of the exercise of the constitutional right of free speech in connection with a public issue or an issue of public interest.  (§ 425.16, subd. (e)(3), (4).)  "In articulating what constitutes a matter of public interest, courts look to certain specific considerations, such as whether the subject of the speech or activity 'was a person or

14

entity in the public eye' or 'could affect large numbers of people beyond the direct participants' [citation] and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation], or 'affect[ed] a community in a manner similar to that of a governmental entity' [citation]." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 145-146.)

Here, the acts from which the counts alleged in the complaint arise include mentioning Jones's name in the film, depicting a marquee with Jones's name on it in the background of a shot, mentioning Jones's name in a fake magazine promoting the film, using Jones as an inspiration for the characters Booth and/or Dalton, and portraying Booth and/or Dalton in proximity to various commercial products like Kraft macaroni and cheese and the Champion logo. In other words, all of the pertinent acts and statements were included in the film and advertisements promoting the film.

The creation of a movie is an exercise of free speech. (E.g., *Musero v. Creative Artists Agency, LLC* (2021) 72 Cal.App.5th 802, 816 (*Musero*); *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280; see also *Olivia N. v. National Broadcasting Co.* (1981) 126 Cal.App.3d 488, 493 (*Olivia N.*) ["[m]otion pictures are accorded First Amendment protections"].) "Steps taken to advance such constitutionally protected expression are properly considered 'conduct in furtherance of' the exercise of the right of free speech within the meaning of section 425.16, subdivision (e)(4)." (*Musero*, *supra*, at 816.) Additionally, insofar as plaintiff's claims relate to the alleged use of Jones's name or likeness in the promotional trailers for the film, our review of the trailers reveals they constitute advertisements for the film, not any other product. We conclude they are "merely . . . adjunct[s] to the

exhibition of the film" (*Guglielmi v. Spelling-Goldberg Productions* (1979) 25 Cal.3d 860, 872 (*Guglielmi*)) and as such constitute noncommercial speech that falls within the scope of anti-SLAPP protection.

The acts and speech at issue also involve issues of public interest. The film concerns the culture of the late 1960s in Hollywood and the Manson family murder of Tate. These are matters of public interest about which discussions are still ongoing. (See, e.g., *Brodeur v. Atlas Entertainment, Inc.* (2016) 248 Cal.App.4th 665, 675; *Dyer*, 147 Cal.App.4th at 1284.) The uses of Jones's name, the portrayal of Booth and/or Dalton in proximity to branded products, and the portrayal of Booth wearing shirts with brand logos on them are details that add to the depiction of the culture in Hollywood in the late 1960s. The public interest in these topics is demonstrated by the numerous articles and reviews discussing the film that defendants submitted in support of the motion, some of which specifically reference Tarantino's inclusion of era-appropriate products, as well as the many-months-long run the film had in theaters (late July to early October 2019).

Plaintiff advances a number of arguments to the contrary, most of which relate back to her contention that the activity on which her complaint is based is simply "false brand endorsement" or, in other words, the recreation of Jones's likeness and portrayal of that likeness in connection with commercial brands, without consent or credit. The film, she claims, is incidental to this false endorsement for profit issue and she asserts there is no public interest in the brand endorsement or in her private dispute with defendants over their alleged use of Jones's likeness. The problem with plaintiff's argument, however, is that the

16

broader creative acts of including the aforementioned aspects in the film and the alleged use of Jones's likeness are inextricably linked.  For example, in the context of the film, any alleged commercial reason for dressing Booth in a t-shirt with the Champion logo on it cannot be isolated from the creative impetus for the same action.  Furthermore, defendants submitted a declaration representing the brands depicted (other than Hennessey) were included for artistic reasons and were used to "capture the look and feel of the time period," and to "accurately portray the late 60s."[11]

Plaintiff also relies upon a handful of cases for the proposition that advertisements for an artistic work are not necessarily noncommercial speech.  (E.g., *Serova v. Sony Music Entertainment* (2022) 13 Cal.5th 859, 867; *Rezec v. Sony Pictures Entertainment, Inc.* (2004) 116 Cal.App.4th 135 (*Rezec*).)  To the extent plaintiff relies on these cases to argue the advertisements for the film should not be eligible for anti-SLAPP protection, the authority is inapposite.  Unlike the advertisements at issue in

---

[11]    Insofar as plaintiff argues the product placement can be considered separately because the film could have been made without the insertion of those products and brands, the contention lacks merit.  "As stated in a different context, '[t]he creative process must be unfettered, especially because it can often take strange turns . . . .  [¶]  . . . We must not permit juries to dissect the creative process in order to determine what was *necessary* to achieve the final product and what was not, and to impose liability . . . for that portion deemed unnecessary.  Creativity is, by its nature, creative.  It is unpredictable.  Much that is not obvious can be necessary to the creative process.' [Citations.]"  (*Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 144-145.)

17

the cases plaintiff cites, the advertisements for the film are not
alleged to include any false statements and are merely adjuncts
of the film.[12] To the extent plaintiff contends these cases
transform the portions of the film with product placement into
commercial speech, that is also incorrect. Both of plaintiff's cases
addressed separate advertisements for creative works, not
allegedly integrated advertising within the works themselves.

### C. Plaintiff's Claims Lack Minimal Merit

"'In order to establish a probability of prevailing on the
claim . . . a plaintiff responding to an anti-SLAPP motion must
"state[ ] and substantiate [ ] a legally sufficient claim."'
[Citation.] Put another way, the plaintiff "must demonstrate that
the complaint is both legally sufficient and supported by a
sufficient prima facie showing of facts to sustain a favorable
judgment if the evidence submitted by the plaintiff is credited."
[Citations.] In deciding the question of potential merit, the trial
court considers the pleadings and evidentiary submissions of both
the plaintiff and the defendant . . . ; though the court does not
*weigh* the credibility or comparative probative strength of
competing evidence, it should grant the motion if, as a matter of
law, the defendant's evidence supporting the motion defeats the
plaintiff's attempt to establish evidentiary support for the claim.
[Citation.]'" (*Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 19-
20.) "[A] plaintiff cannot simply rely on his or her pleadings, even

---

[12] Indeed, *Rezec* notes that where advertisements for a movie
are mere "adjuncts" to exhibition, including advertisements that
reflect characters or portions of the film, they are noncommercial
speech. (*Rezec, supra*, 116 Cal.App.4th at 142-143.)

if verified.  Rather, the plaintiff must adduce competent, admissible evidence." (*Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 480.)

> ### 1.      *Statutory right of publicity*

Civil Code section 3344.1, subdivision (a)(1) provides in pertinent part: "Any person who uses a deceased personality's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without prior consent from the person or persons specified in subdivision (c), shall be liable for any damages sustained by the person or persons injured as a result thereof."

Subdivision (a)(2), however, exempts from subdivision (a)(1) a "play, book, magazine, newspaper, musical composition, audiovisual work, radio or television program, single and original work of art, work of political or newsworthy value, or an advertisement or commercial announcement for any of these works . . . if it is fictional or nonfictional entertainment, or a dramatic, literary, or musical work."  (Civ. Code, § 3344.1, subd. (a)(2).)  But there is also an exception to the exemption.  Under Civil Code section 3344.1, subdivision (a)(3), "If a work that is protected under paragraph (2) includes within it a use in connection with a product, article of merchandise, good, or service, this use shall not be exempt under this subdivision, notwithstanding the unprotected use's inclusion in a work otherwise exempt under this subdivision, *if the claimant proves that this use is so directly connected with a product, article of merchandise, good, or service as to constitute an act of*

19

*advertising, selling, or soliciting purchases of that product, article of merchandise, good, or service by the deceased personality without prior consent* from the person or persons specified in subdivision (c)." (§ 3344.1, subd. (a)(3), italics added.)

Subdivision (k) of the statute provides that "[t]he use of a name, voice, signature, photograph, or likeness in a commercial medium shall not constitute a use for which consent is required under subdivision (a) solely because the material containing the use is commercially sponsored or contains paid advertising. Rather, it shall be a question of fact whether or not the use of the deceased personality's name, voice, signature, photograph, or likeness was so directly connected with the commercial sponsorship or with the paid advertising as to constitute a use for which consent is required under subdivision (a)." (Civ. Code, § 3344.1, subd. (k).)

The film unquestionably falls into the exemption under Civil Code section 3344.1 subdivision (a)(2), as it is an audiovisual work of fictional entertainment.[13] In order to demonstrate minimal merit under subdivision (a)(3), then, plaintiff must have made a prima facie case that the film "includes within it a use [of a deceased personality's name, voice, signature, photograph, or likeness] . . . [that] is so directly connected with a product, article of merchandise, good, or service

---

[13] By its plain terms, Civil Code section 3344.1, subdivision (a)(2) does not require a work to be transformative in order to qualify for its exemption. Accordingly, and contrary to plaintiff's contentions, application of the *Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387 (*Comedy III Productions*), transformative test is unnecessary.

20

as to constitute an act of advertising, selling, or soliciting purchases of that product, article of merchandise, good or services . . . ." (Civ. Code, § 3344.1, subd. (a)(3).)

There is no contention that Jones's voice, signature, or photograph was used in the film. Jones's name is mentioned twice during advertisements for his movie *3 in the Attic* (played within the film), and his name appears fleetingly as characters drive past a marquee promoting the same movie. Plaintiff has not provided any evidence demonstrating these brief references to Jones, which narratively serve to identify Jones as a contemporary of Dalton and Booth, are "so directly connected" to any products, merchandise, good, or service that they constitute advertisements. The same is true of the appearance of Jones's name in promotional trailers for the film and the fake magazine promoting the film.

The true heart of plaintiff's claim is that Booth, and to a lesser extent Dalton, were based on and styled after Jones. Plaintiff identifies aspects of both characters that she contends make up a whole constituting a likeness of Jones. Some of these aspects are physical—like Booth's hairstyle and aviator sunglasses—while others are biographical—like the scene in which Dalton is comforted by a child. While we are doubtful that plaintiff has demonstrated a probability of success in alleging Jones's likeness was used in the film,[14] we need not reach that

---

[14] The biographical similarities, at a minimum, cannot be considered part of Jones's alleged likeness. Similarities between a real person's life experiences and those of a fictional character do not support a claim for misappropriation of that person's "likeness." (*Polydoros v. Twentieth Century Fox Film Corp.* (1997) 67 Cal.App.4th 318, 322-323 (*Polydoros*)*;* see also *Kirby v.*

21

issue to decide plaintiff has not demonstrated a probability of prevailing on her Civil Code section 3344.1 cause of action.

The film depicts Booth and Dalton, though primarily Booth, using a slew of household products and otherwise appearing in scenes that feature brand logos. It also depicts Booth wearing one or more t-shirts with a brand logo on it. In response to plaintiff's allegation, defendants submitted the declaration of producer McIntosh that asserts the only product placement in the film was for Hennessy cognac, a product not used by either Booth or Dalton and thus not associated with Jones's alleged likeness. The declaration further asserts the other products depicted in the film were used solely for creative, not financial, reasons and the filmmakers were not paid to include them. As the film was, in fact, not compensated for the inclusion of the products and was not advertising them through any sort of product placement, Booth and Dalton's proximity to the products was not so directly

---

*Sega of America, Inc.* (2006) 144 Cal.App.4th 47, 55 (*Kirby*) ["[t]he misappropriation of one's "likeness" refers to a person's visual image"].)

Additionally, there is a logical inconsistency to some of plaintiff's arguments. On the one hand, plaintiff argues defendants have improperly linked Jones's character with brand name products without giving her, as the holder of his surviving publicity rights, a slice of the hypothetical endorsement pie. Yet on the other hand, plaintiff argues defendants have misrepresented the characters of Booth and Dalton by stating other actors, not Jones, served as the inspiration for them and unfairly declined to credit Jones. If, as plaintiff claims, defendants were capitalizing on Jones's identity and celebrity, it would seem counterproductive to proclaim actors other than Jones served as the inspiration for Dalton and Booth.

22

connected to any of the products that their presence constituted advertisement or sale.

Thus, even accepting as true plaintiff's evidence on the matter, defendants' evidence "defeats [her] claim as a matter of law." (*Baral, supra*, 1 Cal.5th at 385; see also *J-M Manufacturing Co., Inc. v. Phillips & Cohen LLP* (2016) 247 Cal.App.4th 87, 96 ["the court should grant the motion "'if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim'"'"].) Plaintiff's evidence in support of her claim consists of articles discussing the practice of celebrity endorsements and/or product placement, articles stating the current owner of the Playboy Mansion (at which a scene in the film was shot) is credited as a producer on the film, and declarations from friends and family members asserting their personal opinions about the inclusion of brand name products in the film. None of these are sufficient to overcome defendants' evidence.

### 2. *Lanham Act*

"Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), forbids the use of false designations of origin and false descriptions or representations in the advertising and sale of goods and services. [Citation.]" (*Smith v. Montoro* (9th Cir. 1981) 648 F.2d 602, 603.) Plaintiff argues the trial court erred in finding her Lanham Act claims for false endorsement and trademark infringement did not have minimal merit.[15]

---

[15] Plaintiff's complaint also makes reference to a claim for "reverse passing off." As plaintiff does not advance any arguments in support of the claim on appeal, we deem it abandoned.

### a. false endorsement

"Courts recognize false endorsement claims 'brought by plaintiffs, including celebrities, for the unauthorized imitation of their distinctive attributes, where those attributes amount to an unregistered commercial "trademark."' [Citation.] The Lanham Act 'prohibits only false endorsement, not mere use of an image or name.' [Citations.] In other words, not all uses of a celebrity's image or likeness are actionable under § 1125(a)—only those which 'suggest sponsorship or approval are prohibited.' [Citation.] The key inquiry for a false endorsement claim is whether the unauthorized use of the plaintiff's distinctive attributes is 'likely to confuse consumers as to the plaintiff's sponsorship or approval of the product.' [Citation.] This means 'show[ing] more than simply a possibility of confusion.' [Citation.]" (*Miller v. Easy Day Studios Pty. Ltd.* (S.D. Cal., Sept. 16, 2021, No. 20-CV-02187-LAB-DEB) 2021 U.S. Dist. Lexis 176582).)

"'Generally, to assess whether a defendant has infringed on a plaintiff's trademark, we apply a "likelihood of confusion" test that asks whether use of the plaintiff's trademark by the defendant is "likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association' of the two products. [Citation.]" [Citations.]" (*No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018, 1037.) However, "[t]he test does not apply in a case such as this, in which there is a colorable defense that the use of the celebrity's likeness or identity is entitled to First Amendment protection." (*Kirby*, *supra*, 144 Cal.App.4th at 57, fn. 4.) Under these circumstances, we must consider "the intersection of trademark law and the First Amendment." (E.S.S. *Entm't 2000, Inc. v. Rock Star Videos,*

*Inc.* (9th Cir. 2008) 547 F.3d 1095, 1099 (*E.S.S.*).)  In doing so, we apply the test articulated in *Rogers v. Grimaldi* (2d Cir. 1989) 875 F.2d 994 (*Rogers*).  (E.g., *Mattel, Inc. v. MCA Records* (9th Cir. 2002) 296 F.3d 894, 902 [adopting *Rogers* test]; *E.S.S., supra*, at 1099 [extending applicability of *Rogers* from titles of artistic works to use of trademark in the body of the work]; see also *Winchester Mystery House, LLC v. Global Asylum, Inc.* (2012) 210 Cal.App.4th 579, 590 (*Winchester*) [applying *Rogers* test to Lanham Act claim].)

For the *Rogers* test to apply, defendants must "'make a threshold legal showing that [their] allegedly infringing use is part of an expressive work protected by the first amendment.'" (*Dickinson v. Ryan Seacrest Enterprises Inc.* (9th Cir. 2020) 839 F. App'x 110, 111.)  There can be no serious contention that the film is not an expressive work, including the scenes featuring Jones's alleged likeness in proximity to branded products and featuring, however briefly, Jones's name.

*Rogers* accordingly requires plaintiff to "show that the defendant[s'] use of the mark is either: (1) 'not artistically relevant to the underlying work[,]' or (2) 'explicitly misleads consumers as to the source or content of the work.'  [Citation.]" (*VIP Prods. LLC v. Jack Daniel's Props., Inc.* (9th Cir. 2020) 953 F.3d 1170, 1174.)  "The first prong of the *Rogers* test requires only that the title pass 'the appropriately low threshold of minimal artistic relevance' to the content of the film." (*Winchester, supra*, 210 Cal.App.4th at 590; see also *E.S.S., supra*, 547 F.3d 1100 ["the level of relevance merely must be above zero"].)  Here, all of the referenced uses of Jones's name and alleged likeness are artistically relevant to the film, as they add to the depiction of the culture and times of the late 1960s.

25

(*See Twentieth Century Fox Television v. Empire Distribution, Inc.* (9th Cir. 2017) 875 F.3d 1192, 1199 [defendant's use of trademark had "artistic relevance by supporting the themes and geographic setting of the work"].)

The second prong of the *Rogers* test requires a showing that the use of Jones's likeness "explicitly misleads" consumers as to the source or content of the work. (*Winchester*, *supra*, 210 Cal.App.4th at 592; *Rogers*, *supra*, 875 F.2d at 999.) The relevant inquiry is whether people watching the film would be misled into thinking Jones endorsed or sponsored the film. (*E.S.S.*, *supra*, 547 F.3d at 1100.) "[T]he mere use of a trademark alone cannot suffice to make such use explicitly misleading." (*Ibid*.) Assuming for the sake of argument that Jones's likeness is used in the film, the film does not indicate or suggest that Jones either endorsed or sponsored the film. The uses of Jones's name itself are brief background moments linked to Jones's film *3 in the Attic* that serve to situate Jones as a contemporary of Dalton and Booth. They do not suggest either endorsement or sponsorship. Though the question of customer confusion is a factual one, it is simply not plausible that a reasonable viewer watching the film would be misled. Accordingly, "[t]he *Rogers* test tells us that, in this case, the public interest in free expression outweighs the public interest in avoiding consumer confusion." (*Brown v. Electronic Arts, Inc.* (9th Cir. 2013) 724 F.3d 1235, 1248 (*Brown*).)

Plaintiff's attempt to rely on survey evidence to demonstrate consumer confusion is unpersuasive. Survey evidence does not establish that the use of the likeness is explicitly misleading to consumers. (*Brown*, *supra*, 724 F.3d at 1245-1246.) "To be relevant, evidence must relate to the nature of the behavior . . . not the impact of the use." (*Id.* at 1246.) The

declarations plaintiff refers to as survey evidence thus do not support the claim that the alleged use was explicitly misleading.

            b.       trademark infringement

"A trademark may be protected under . . . the Lanham Act if it is either inherently distinctive or has acquired distinctiveness." (*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 336 (*Franklin Mint*).) Plaintiff contends she has viable claims for trademark infringement based on Jones's name and likeness, and based on trade dress. None of these three theories is viable.

First, personal names are generally descriptive, not inherently distinctive, and require proof of secondary meaning for protection. (*Id.* at 337.) A mark has acquired secondary meaning "if the public comes to associate [it] with a specific source." (*Kendall-Jackson Winery v. E. & J. Gallo Winery* (9th Cir.1998) 150 F.3d 1042, 1047; *Franklin Mint*, *supra*, 184 Cal.App.4th at 338 ["secondary meaning 'occurs when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself"'"].) "'Factors considered in determining whether a secondary meaning has been achieved include: (1) whether actual purchase[r]s of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark and, (4) whether use of the claimed trademark has been exclusive.'" (*Levi Strauss & Co. v. Blue Bell, Inc.* (9th Cir. 1985) 778 F.2d 1352, 1358.) Jones's name is not inherently distinctive, and plaintiff did not present evidence indicating his name had acquired a secondary meaning.

Accordingly, plaintiff did not demonstrate her trademark infringement claim based on Jones's name had minimal merit.

Second, "as a general rule, a person's image or likeness cannot function as a trademark" because it does not "perform the trademark function of designation." (*ETW Corp. v. Jireh Publishing, Inc.* (6th Cir. 2003) 332 F.3d 915, 922.) "Under some circumstances, a photograph of a person may be a valid trademark—if, for example, a particular photograph was consistently used on specific goods." (*Pirone v. MacMillan, Inc.* (2d Cir. 1990) 894 F.2d 579, 583.) Here, plaintiff did not present evidence of any such consistent use of a photograph or likeness of Jones, or any evidence that Jones's likeness otherwise performs the "trademark function of designation." Instead, she broadly claims rights to images and portrayals that she believes resemble Jones's likeness. That is insufficient.

Finally, plaintiff argues she had a viable Lanham Act claim based on infringement of Jones's trade dress. "Trade dress refers generally to the total image, design, and appearance of a product and 'may include features such as size, shape, color, color combinations, texture or graphics.'" (*Clicks Billiards, Inc. v. Sixshooters, Inc.* (9th Cir. 2001) 251 F.3d 1252, 1257.) Common trade dress claims involve the appearance of restaurants and similar establishments, or the appearance of products such as wine bottles. (E.g., *ibid.*; *Nova Wines, Inc. v. Adler Fels Winery LLC* (N.D. Cal. 2006) 467 F.Supp.2d 965, 977.) Plaintiff has not cited, and we have not found, any authority suggesting that an individual's appearance, manner of dress, or details regarding an individual's life can constitute protectable trade dress. Nor do we believe such a claim would be viable, at least under the circumstances here. (See *Davis v. Adler* (S.D. Cal., Sept. 13,

28

2017, No. 17-CV-387-AJB-JLB) 2017 WL 4050352, at *3 [contention that plaintiff's "likeness [wa]s being commercialized [wa]s not an appropriate trade dress claim under the law"].) Accordingly, plaintiff's trade dress theory lacks minimal merit too.

### 3. Unfair Competition Law

The complaint alleges a cause of action under the unfair prong of California's Unfair Competition Law (Bus. & Prof. Code, § 17200.) "[A]ctions pursuant to [ . . . section] 17200 are 'substantially congruent' to claims made under the Lanham Act." (*Cleary v. News Corp.* (9th Cir. 1994) 30 F.3d 1255, 1263. "This means that if claims relying on the exact same factual conduct are validly dismissed under the Lanham Act, they should also be dismissed under California Unfair Competition law." (*Dr. Seuss Enters., L.P. v. ComicMix LLC* (S.D.Cal. 2017) 256 F. Supp. 3d 1099, 1113; see also *E.S.S.*, *supra*, 547 F.3d at 1101 [summary judgment proper on both Lanham Act and UCL claims because "First Amendment defense [under *Rogers*] applies equally to ESS's state law claims as to its Lanham Act claim"]; *Twentieth Century Fox TV v. Empire Distrib.* (C.D.Cal. 2016) 161 F. Supp. 3d 902, 910 [conclusion that First Amendment barred Lanham Act claim also barred UCL claim].) Plaintiff's UCL claim is based on the same facts as her Lanham Act claim.[16] Because the latter is not viable, so is the former.

---

[16] To the extent plaintiff contends she also alleges a UCL claim based on her statutory right of publicity claim, she failed to make a prima facie showing on that claim for the reasons we have already given in connection with our discussion of Civil Code section 3344.1.

## 4. Negligence

Plaintiff's negligence cause of action alleges defendants owed plaintiff a duty not to use Jones's publicity rights and breached that duty by using those rights, thereby injuring plaintiff. Even assuming defendants had some duty not to use Jones's name or alleged likeness in the film, plaintiff has not made a showing of probability of success on the merits because she has not made a prima facie case that any such duty was breached.

"Motion pictures are accorded First Amendment protections." (*Olivia N.*, *supra*, 126 Cal.App.3d at 493 [noting imposition of negligence liability for creative decisions would have an undesirable chilling effect].) "The commercial nature of an enterprise does not introduce a nonspeech element or relax the scrutiny required by the First Amendment." (*Ibid.*) "Because respondents' artistic effort is constitutionally guaranteed, it was not negligent."[17] (*Polydoros*, *supra*, 67 Cal.App.4th at 326.) Here, as in *Polydoros*, defendants' creation of the film, an artistic endeavor, is protected by the First Amendment. As a result, plaintiff did not demonstrate that her negligence claim had minimal merit.

## 5. Common law right of publicity

The right of publicity in California is both a common law right and a statutory right (codified at the aforementioned Civil

---

[17] The First Amendment is, of course, not absolute. But the complaint does not allege defendants engaged in any unprotected speech.

30

Code section 3344.1). (*Comedy III Productions, supra*, 25 Cal.4th at 391.) The common law "cause of action [does] not survive the death of the person whose identity was exploited and [is] not descendible to his or her heirs or assignees." (*Ibid.*; see also *Lugosi v. Universal Pictures* (1979) 25 Cal.3d 813, 819-821 (*Lugosi*); *Guglielmi, supra*, 25 Cal.3d at 861.) Because Jones is deceased, plaintiff cannot demonstrate a probability of success on the merits of her common law claim.

Plaintiff argues in response that Jones's publicity rights were assigned in 2011, while he was still living, not upon his death in 2014. Her principal authority for that is the dissenting opinion in *Lugosi*, which we are not bound to follow and do not follow. Plaintiff also relies upon *Estate of Fuller v. Maxfield & Oberton Holdings, LLC* (N.D.Cal. 2012) 906 F.Supp.2d 997, 1008. The court in that case, however, similarly recognized that "the common law cause of action for misappropriation does not apply to deceased persons" and dismissed the common law claims on that basis.[18] (*Ibid.*)

---

[18] Plaintiff's opening brief also includes a list of procedural requests that were denied, such as requests to file a first amended complaint, and to conduct limited discovery. Plaintiff provides no argument or authority indicating those denials were erroneous. To the extent plaintiff intended to appeal them, she has waived the issue. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

*D.      Attorney Fees*

A notice of appeal must be filed the earlier of 60 days after the superior court clerk or a party serves notice of entry of judgment or 180 days after entry of judgment.  (Cal. Rules of Court, rule 8.104(a)(1)(A)-(C).)  "'[T]he timely filing of an appropriate notice of appeal or its legal equivalent is an absolute prerequisite to the exercise of appellate jurisdiction.'" (*K.J. v. Los Angeles Unified School Dist.* (2020) 8 Cal.5th 875, 881; see Cal. Rules of Court, rule 8.104(b) ["If a notice of appeal is filed late, the reviewing court must dismiss the appeal"].)

Defendants served the notice of entry of the fee order on December 11, 2020.  Plaintiff's deadline to file a notice of appeal was thus February 9, 2021.  Plaintiff's initial notice of appeal was file-stamped at 12:00 a.m. on February 10, 2021.  California Rule of Court Rule 8.77(c) provides that "[a] document that is received electronically by the court after 11:59 p.m. is deemed to have been received on the next court day."  The notice of appeal is thus facially untimely.  (See, e.g., *Hollister Convalescent Hosp., Inc. v. Rico (*1975) 15 Cal.3d 660, 666-674 (*Hollister*) [dismissing appeal where notice was filed one day late]; *Nu-Way Associates, Inc. v. Keefe* (1971) 15 Cal.App.3d 926, 927-928 [same].)

Plaintiff argues California Rule of Court Rule 8.77(d) should save her appeal.  Rule 8.77(d) provides that "[i]f a filer fails to meet a filing deadline imposed by court order, rule, or statute because of a failure at any point in the electronic transmission and receipt of a document the filer may file the document on paper or electronically as soon thereafter as practicable and accompany the filing with a motion to accept the document as timely filed. For good cause shown, the court may enter an order permitting the document to be filed nunc pro tunc

32

to the date the filer originally sought to transmit the document electronically."

Plaintiff submitted a declaration establishing she visited the "File Now" page of Nationwide Legal, the service she used to file the notice of appeal, at 11:49 p.m. on February 9, 2021. Her declaration also asserts she visited or logged in to the Nationwide Legal website at 11:52 p.m. Plaintiff then asserts a "slow connection" caused a delay in her transmission, resulting in the 12:00 a.m. timestamp on her notice of appeal. Though she implies she actually submitted the notice of appeal between 11:49 and 11:52 p.m., plaintiff's declaration does not directly identify the time at which the document was submitted.

In any event, we do not believe a "slow connection" resulting in a delay of a few minutes between the submission of an electronically-filed document and its receipt by the court is a "failure . . . in the electronic transmission" as contemplated by Rule 8.77(d). If relatively short delays in last-minute filings were meant to be excused, Rule 8.77(c) would provide that any document *submitted* after 11:59 p.m., rather than *received* by the court after that time, is deemed filed the next court day. Reading the two portions of Rule 8.77 together, we conclude that because plaintiff's original notice of appeal was received by the court and file-stamped at 12:00 a.m. on February 10, 2021, it was untimely.

Just as important, however, is the fact that the notice of appeal that plaintiff filed one minute late was still insufficient to invoke this court's jurisdiction because it did not specify the order or judgment from which plaintiff was appealing. While a court might find reason to excuse a one-minute delay for a properly prepared notice of appeal, that is not what we have here. We instead confront an appeal that was properly noticed hours late

33

on the 61st day. Dismissal in that circumstance is appropriate. (E.g., *Estate of Hanley* (1943) 23 Cal.2d 120, 122 [timely filing of a notice of appeal is an essential jurisdictional requirement]; *In re Marriage of Eben-King & King* (2000) 80 Cal.App.4th 92, 116; see also *Hollister*, *supra*, 15 Cal.3d at 674.)

## DISPOSITION

The appeal in case number B310814 is dismissed. The judgment in case number B304256 is affirmed. Defendants are awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

KIM, J.