[No. B103309. Second Dist., Div. Two. Aug. 27, 1997.*]

MICHAEL POLYDOROS, Plaintiff and Appellant, v.
TWENTIETH CENTURY FOX FILM CORPORATION et al., Defendants
and Respondents.

*Review granted November 19, 1997. Review dismissed October 14, 1998, and the opinion was ordered published.

---

**COUNSEL**

Nate G. Kraut, Freund & Brackey, Jonathan D. Freund and Thomas A. Brackey II for Plaintiff and Appellant.

Wyman, Isaacs, Blumental & Lynne, Bruce Isaacs, Valerie Waldman, Karen Brodkin, Doniger & Fetter, Thomas Doniger, Henry D. Fetter, Stein & Kahan, Stanton L. Stein, Marcia J. Harris and Gregory A. Nylen for Defendants and Respondents.

---

**OPINION**

**BOREN, P. J.**—A noncelebrity sued the makers and distributors of a film called THE SANDLOT (Twentieth Century Fox 1993), claiming that the filmmakers invaded his privacy by appropriating his name and likeness. We conclude that the filmmakers' release of a patently fictional movie did not invade the plaintiff's privacy and is, in any event, protected by constitutional guarantees of free expression. Moreover, the film is not defamatory. Accordingly, we affirm the trial court's judgment in favor of the defendant filmmakers.

### FACTS

In 1993, respondents released THE SANDLOT, a comedic coming-of-age story set in the San Fernando Valley in the 1960's. The film's protagonists are a motley group of boys on a sandlot baseball team who, in the course of one summer, overcome various adversaries, including a disdainful, well-funded opposing team and a gigantic, ferocious dog that has taken possession of the team's baseballs and secreted them in a neighboring yard. One of the boys on the sandlot team is a character named Michael Palledorous, nicknamed "Squints." The Palledorous character is one of the team's leaders, and spearheads the team's valiant efforts to reclaim a baseball autographed by Babe Ruth from the slavering canine next door.

Appellant Michael Polydoros grew up in a setting similar to that described in the film. Appellant was a schoolmate of respondent David Mickey Evans. Evans wrote and directed THE SANDLOT. A photograph of appellant dating

from the 1960's is similar to a photograph of the Palledorous character in the movie, right down to appellant's eyeglasses and the color and design of his shirt. Appellant played baseball with friends on a sandlot when he was a child, swam in a community pool like the one shown in the movie, and was somewhat obstreperous, like the "Squints" character. Other than the similarity in names and attire, the enjoyment of baseball and swimming, and the brash nature of the "Squints" character, appellant cannot point to any other aspects in which the film accurately depicts his life. Appellant concedes that the work is fiction. He also concedes that he has not been financially damaged by the motion picture.

Piqued by the similarities in name and by the physical likeness of the "Squints" character to himself as a child, appellant filed suit in March of 1994. The operative pleading asserts causes of action for commercial appropriation of identity, invasion of privacy, negligence and defamation. Appellant alleges that the nickname "Squints" used in the film "is a blatantly derogatory moniker derived from the thick glasses the character wears throughout the film" and that people began teasing appellant by calling him "Squints." Appellant felt "embarrassed and humiliated" by the nickname. To make matters worse, in appellant's view, respondents used the "Squints" Palledorous character as their principal advertising image for the film.

In January of 1996, the parties filed cross-motions for summary judgment. The trial court ruled in favor of respondents on March 25, 1996. It found that respondents are entitled to judgment because their film and the characters it portrays are protected speech under the federal and state Constitutions. The court also concluded that THE SANDLOT is demonstrably a work of fiction which does not defame Polydoros as a matter of law. A timely appeal was taken from the trial court's judgment.

## DISCUSSION

### 1. *Commercial Appropriation of Identity*

■ Appellant maintains that he can proceed with a common law claim for invasion of privacy as well as a claim under Civil Code section 3344 because respondents exploited his name and likeness for commercial gain.[1] Respondents counter that their film, as a work of fiction rather than an advertisement, is absolutely protected by the constitutional right to free

---

[1]Civil Code section 3344 provides, "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof."

speech and artistic expression. Respondents also argue that there is no evidence that they knowingly used appellant's name or likeness for a commercial purpose, as required by section 3344.[2]

### a. *Appellant Cannot Establish the Elements of His Claim*

To succeed in his claims, appellant must establish a direct connection between the use of his name or likeness and a *commercial* purpose. (*Fleet* v. *CBS, Inc.* (1996) 50 Cal.App.4th 1911, 1918 [58 Cal.Rptr.2d 645].) The law was never intended to apply to works of pure fiction: "[A]s a matter of law, mere similarity or even identity of names is insufficient to establish a work of fiction is of and concerning a real person." (*Aguilar* v. *Universal City Studios, Inc.* (1985) 174 Cal.App.3d 384, 388 [219 Cal.Rptr. 891].)

Invasion of privacy claims have been rejected by the courts when there is merely alleged to be some resemblance between an actual person and a character in a work of fiction. In *Aguilar*, for example, the plaintiff alleged that the movie ZOOT SUIT (Universal Pictures 1981) invaded her privacy by exposing "unsavory incidents" from her adolescence through the use of a character who shared plaintiff's surname. The court observed that the plaintiff, a grown woman, was not the 13-year-old person shown in the movie, although plaintiff was 13 at the time of the historical incident recreated in the movie. Because there was no consonance between the plaintiff's present age and the movie character's age or physical appearance, and because plaintiff's actual experiences diverged in many respects from those of the character who shared her name, no trier of fact could reasonably draw a connection between the two. (174 Cal.App.3d at pp. 389, 390-391.)

We find particularly compelling the reasoning in the New York case of *People* v. *Charles Scribner's Sons* (1954) 205 Misc. 818 [130 N.Y.S.2d 514], which involved the interpretation of a commercial appropriation of likeness statute.[3] The complainant in that case, Joseph A. Maggio, served in the United States Army in Hawaii in the early 1940's in the same Army company as James Jones. Jones thereafter authored a successful book entitled, From Here to Eternity (1951) which was made into a motion picture. The book tells a story about Army personnel stationed in Hawaii in the early 1940's. One of the characters portrayed in the book and film is called "Angelo Maggio" or "Maggio." Despite the obvious similarities in name and

---

[2]The difference between the common law and the statutory actions is that Civil Code section 3344 requires a *knowing* use of the plaintiff's name or likeness, whereas mistake and inadvertence are not a defense against commercial appropriation at common law. (*Eastwood* v. *Superior Court* (1983) 149 Cal.App.3d 409, 417, fn. 6 [198 Cal.Rptr. 342].)

[3]The New York statute imposed a criminal penalty on those making unauthorized commercial use of a person's name or likeness.

his former contact with the author, Maggio did not claim that the story portrayed acts performed by him: "Except for the alleged identity of name, none of the things which the character 'Angelo Maggio' does in the book, nor any of the details of the background and life of 'Angelo Maggio' as set forth in the book, are claimed by the complainant to be a portrayal of him or of his life and do not in any wise point to or identify him as the person intended or referred to." (130 N.Y.S.2d at p. 517.) As the court noted, if the author had not chosen the name "Maggio" for his fictional character, "the complainant could not by any stretch of the imagination have implied any identity of the character with himself." (*Id.* at p. 518.)

The court rejected the misappropriation of name charge made against the book publisher and the motion picture company. It wrote, "It is generally understood that novels are written out of the background and experiences of the novelist. The characters portrayed are fictional, but very often they grow out of real persons the author has met or observed. This is so also with respect to the places which are the setting of the novel. The end result may be so fictional as to seem wholly imaginary, but the acorn of fact is usually the progenitor of the oak, which when fully grown no longer has any resemblance to the acorn. In order to disguise the acorn and to preserve the fiction, the novelist disguises the names of the actual persons who inspired the characters in his book. Since a novel is not biography, the details of the character's life and deeds usually have, beyond possible faint outlines, no resemblance to the life and deeds of the actual person known to the author. Thus, the public has come to accept novels as pure fiction and does not attribute their characters to real life." (*People* v. *Charles Scribner's Sons*, *supra*, 130 N.Y.S.2d at pp. 517-518; accord, *Middlebrooks* v. *Curtis Publishing Company* (4th Cir. 1969) 413 F.2d 141, 143.)

For the reasons cited in *Aguilar* and *Maggio*, the cases above, appellant cannot state a claim that respondents invaded his privacy by appropriating his name or likeness for commercial purposes. First, there was a marked difference in age and appearance between our appellant, the 40-year-old Michael Polydoros, and the 10-year-old character of Squints Palledorous. No person seeing this film could confuse the two. Second, the rudimentary similarities in locale and boyhood activities do not make THE SANDLOT a film about appellant's life. This is a universal theme and a concededly fictional film. The faint outlines appellant has seized upon do not transform the fiction into fact.

b. *The Film Is Constitutionally Protected*

Film is a "significant medium for the communication of ideas" and, whether exhibited in theaters or on television, is protected by constitutional

guarantees of free expression. (*Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495, 501-502 [72 S.Ct. 777, 780, 96 L.Ed. 1098]; *Guglielmi* v. *Spelling-Goldberg Productions* (1979) 25 Cal.3d 860, 865 [160 Cal.Rptr. 352, 603 P.2d 454].) Popular entertainment is entitled to the same constitutional protection as the exposition of political ideas: "It is clear that works of fiction are constitutionally protected in the same manner as political treatises and topical news stories." (25 Cal.3d at p. 867.)

The plaintiff in *Guglielmi* was the nephew of deceased silent picture star Rudolph Valentino and had a proprietary interest in the commercial use of Valentino's name and likeness. He sued the defendants after they exhibited a film purporting to recreate a portion of the life of Valentino using Valentino's name, likeness and personality. Plaintiff alleged that the film did not truthfully portray Valentino's life and that Valentino's name and likeness were used to sell or commercially exploit the film for defendants' profit. (25 Cal.3d at p. 862.)

At the heart of *Guglielmi* was the fictional nature of the film exhibited by the defendants. Four justices of the Supreme Court agreed that plaintiff was protected by the common law right of publicity. (25 Cal.3d at p. 864.)[4] Nevertheless, the context and nature of the defendants' use of Valentino's name and likeness in a *fictional* work of art, even if created *for financial gain*, was protected by the constitutional right to free expression, the justices concluded. (*Id.* at pp. 864-865, 868-870.) They observed, "The First Amendment is not limited to those who publish without charge. Whether the activity involves newspaper publication or motion picture production, it does not lose its constitutional protection because it is undertaken for profit. (*Time, Inc.* v. *Hill* (1967) 385 U.S. 374, 397 . . . .) The fact that respondents sought to profit from the production and exhibition of a film utilizing Valentino's name and likeness is not constitutionally significant." (25 Cal.3d at pp. 868-869; accord, *Joseph Burstyn, Inc.* v. *Wilson, supra,* 343 U.S. 495, 501-502 [72 S.Ct. 777, 780-781].)

 *Guglielmi* unequivocally prevents appellant from proceeding on his claim for commercial appropriation of identity. There is no question that THE SANDLOT is a fanciful work of fiction and imagination. In the movie, the dog next door to the sandlot assumes the proportions of a grizzly bear (having been magnified by the boys' fear); baseball hero Babe Ruth appears and offers advice (notwithstanding Ruth's death some 20 years before the

---

[4]A brief per curiam opinion in *Guglielmi* follows a companion case, *Lugosi* v. *Universal Pictures* (1979) 25 Cal.3d 813 [160 Cal.Rptr. 323, 603 P.2d 425, 10 A.L.R.4th 1150]. A second opinion authored by the Chief Justice is joined by three other justices and addresses the constitutional issues. All references to *Guglielmi* are to the second opinion.

movie takes place); the dog's owner just happens to be a former teammate of Babe Ruth; the "Squints" character fakes his own drowning death in order to sneak a kiss from the pretty female lifeguard, and so on. Appellant does not attempt to suggest that any of this is true or actually happened to him.[5] Because the film is obvious fantasy, appellant could not reasonably suffer injury to his feelings or his peace of mind. (See *Dora* v. *Frontline Video, Inc.* (1993) 15 Cal.App.4th 536, 542 [18 Cal.Rptr.2d 790].) This film is not a portrait of appellant's life and reveals no private facts about appellant: His name and former physical appearance are not private facts.

Appellant is especially vexed because respondents used photographs of "his" character in particular to advertise and promote public viewing of THE SANDLOT. This issue is addressed in *Guglielmi*. A filmmaker's use of photographs of an actor resembling an actual personage to promote a fictional work is "merely an adjunct to the exhibition of the film." (*Guglielmi* v. *Spelling-Goldberg Productions, supra*, 25 Cal.3d at p. 872.) "Having established that any interest in financial gain in producing the film did not affect the constitutional stature of respondents' undertaking, it is of no moment that the advertisements may have increased the profitability of the film. It would be illogical to allow respondents to exhibit the film but effectively preclude any advance discussion or promotion of their lawful enterprise. Since the use of Valentino's name and likeness in the film was not an actionable infringement of Valentino's right of publicity, the use of his identity in advertisements for the film is similarly not actionable." (25 Cal.3d at p. 873; accord, *Cher* v. *Forum Intern., Ltd.* (9th Cir. 1982) 692 F.2d 634, 639 and *Montana* v. *San Jose Mercury News, Inc.* (1995) 34 Cal.App.4th 790, 797 [40 Cal.Rptr.2d 639] [advertising to promote a story is protected by the First Amendment and is not actionable under an appropriation of publicity theory so long as the advertising does not claim that the story subject endorses the news medium].)

In sum, appellant is not entitled to recover under a commercial appropriation of name or likeness theory merely because respondents used a name that sounds like appellant's name or employed an actor who resembles appellant at the age of 10. Because respondents were creating a fictionalized artistic work, their endeavor is constitutionally protected. This right was not diminished when respondents advertised then sold their work as mass public entertainment.

---

[5]*Guglielmi* states, "Whether respondents' work constitutes a serious appraisal of [appellant's] stature or mere fantasy is a judgment left to the reader or viewer, not the courts." (25 Cal.3d at p. 870.) While conceding that THE SANDLOT is fantasy, appellant posits that he should be able to dictate the screenplay himself rather than leaving it to the imagination of the author: Appellant testified, "I had absolutely no say so in the direction this character took who was me. I had absolutely no say so in the events or in the actions that the character did. I had no say so on how he spoke or anything that he did."

## 2. *Negligence*

Appellant argues that even if respondents are "immune" from liability under Civil Code section 3344, they can nevertheless be found liable for negligence using section 3344 as a standard of care. His argument is unpersuasive. Respondents are "immune" from liability because they have a constitutional right to free expression, which they exercised when they made and released this film. Because respondents' artistic effort is constitutionally guaranteed, it was not negligent. Nor was respondents' use of the "Squints" character negligent because there is an entertainment industry custom of obtaining "clearance" of all characters featured in both fictional and nonfiction motion pictures. It simply was not necessary to do so in this case. The industry custom of obtaining "clearance" establishes nothing, other than the unfortunate reality that many filmmakers may deem it wise to pay a small sum up front for a written consent to avoid later having to spend a small fortune to defend unmeritorious lawsuits such as this one.

## 3. *Defamation*

Appellant attacks respondents' film as containing a defamatory portrayal of him. He points to the Palledorous character's nickname of "Squints" as a mockery of his visual impairment, and objects to other infantile epithets hurled at the character such as "little pervert," "pretty crappy," "dead fish," "reject," and "an insult to the game."

The difficulty with appellant's argument is that this film is manifestly not about appellant. It is about a fictional character who finds himself in various humorous or absurd situations but who ultimately emerges triumphant. As previously noted, appellant has never claimed that this film recreates true-life events. At most, the fictional character physically resembles appellant in the 1960's, a fact which would be lost to anyone who was not acquainted with appellant when he was 10 years old. There is no law providing relief for defamation by a fictional work which does not portray the plaintiff at all. (*Rogers* v. *Grimaldi* (2d Cir. 1989) 875 F.2d 994, 1005.) No sensible person could assume or believe from seeing THE SANDLOT that it purports to depict the life of Michael Polydoros. (*Aguilar* v. *Universal City Studios, Inc., supra,* 174 Cal.App.3d 384, 388.)

Finally, the "defamatory" language to which appellant points is not actionable. ▮ Whether a published statement is actionable fact or nonactionable opinion is to be decided by the court as a matter of law. (*Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87].) Rhetorical hyperbole and vigorous epithets are not defamatory,

and to label them so would subvert the right to free speech. (*Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6, 14 [90 S.Ct. 1537, 1542, 26 L.Ed.2d 6]; *Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425]; see also *Letter Carriers* v. *Austin* (1974) 418 U.S. 264, 267-268, 284 [94 S.Ct. 2770, 2773, 2781, 41 L.Ed.2d 745] [publication calling plaintiff a "scab," which was then defined in the piece as a "traitor" who had "rotten principles" and lacked character, while pejorative, was not libelous].) ██ In the context presented here, a playground setting populated by small boys, childish name-calling can hardly be deemed defamatory. The playful exaggerations bandied by the fictional movie characters obviously do not apply to 40-year-old Michael Polydoros.

## DISPOSITION

The judgment is affirmed.

Fukuto, J., and Nott, J., concurred.