Filed 8/28/25  Rodriguez v. Netflix CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| FRANCISCO FERRERAS RODRIGUEZ, | B338932 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 23STCV08993) |
| v. | |
| NETFLIX, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from orders of the Superior Court of Los Angeles County, Bruce G. Iwasaki, Judge. Affirmed.

Rufus-Isaacs Acland & Grantham, Alexander Rufus-Isaacs; and Rodney Smolla for Plaintiff and Appellant.

Latham & Watkins, Marvin S. Putnam, Laura R. Washington, Sakina J. Haji; Jenner & Block and Peter E. Davis for Defendants and Respondents.

———————————

Plaintiff Francisco Ferreras Rodriguez (Ferreras[1]) appeals the trial court's orders granting a Code of Civil Procedure section 425.16[2] special motion to strike, granting a motion to quash service of summons, and making certain evidentiary and discovery rulings in this defamation action. We conclude the trial court did not err in granting the anti-SLAPP motion. We also conclude California courts lack personal jurisdiction over Belgian company Versus Production SRL (Versus). Accordingly, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Ferreras is a professional no limit freediving champion who set 21 world records over the course of his career, the most recent in 2003. Freedivers hold their breath while underwater and do not use a breathing apparatus. Freediving comprises several categories with different equipment and rules, including no limit, CNF (constant weight no fins), and CWF (constant weight with fins). In no limit freediving, the diver is attached to a sled that is lowered underwater to a specified depth; the diver then inflates a lift bag, which fills with air to return the sled and the diver to the surface.

Ferreras was married to Audrey Mestre, herself a world record setting no limit freediving champion who learned the sport under his tutelage. Mestre died in an accident on October 12, 2002, while attempting a new world record no limit freedive of 171 meters in the water off the Dominican Republic. This appeal arises from a lawsuit Ferreras filed in April 2023 for defamation and false light invasion of privacy in the French film,

---

[1]    Plaintiff is called by several different names in the briefs and record, but we adopt the name he used in his complaint.

[2]    Undesignated statutory references are to the Code of Civil Procedure.

*Sous Emprise* (Netflix, Inc. 2022) (in English, *No Limit*) (the Film). Ferreras claimed that while the Film "present[s] itself as a fictional work," it was a thinly veiled portrayal of his life with Mestre and the events of her death, and that it falsely implicated him in causing her death.

Defendant David Rosenthal wrote and directed the Film. Defendant Netflix, Inc. (Netflix, and with Rosenthal, the Netflix Defendants) acquired the streaming rights to the Film in 2021 and released the Film to its customers worldwide in 2022. Defendant Versus is a Belgian limited liability company that produced the Film and licensed it to Netflix.

## I.     The Film

Netflix promoted the Film as a " 'romantic drama' " about a " 'young woman [who] finds deep, destructive love with her record-holding freediving instructor.' "[3] As the Film begins, a message appears after the opening credits stating "inspired by real events." (Capitalization omitted.)

The Film's main female character is Roxana Aubry, "a beautiful, athletic young French woman in her 20's." Roxana attends a diving course taught by "2015 world champion Pascal Gautier" in Porquerolles, France in May 2016. (Capitalization omitted.) She becomes romantically involved with Pascal and joins his diving team. They live together in Porquerolles and attend international diving competitions. In August 2016, Pascal sets a new world record freedive of 172 meters.

Pascal stops freediving competitively on his doctor's advice after he suffers underwater blackouts. He teaches the sport to

---

[3]     The facts in this part are derived from the complaint and our review of the copy of the Film included in the record on appeal.

3

Roxana, who begins to compete internationally and sets a French women's CWF record at her first competition in Italy in 2016. At the same competition, a blonde female American diver sets a new world record in no limit freediving for both men and women.

Roxana's relationship with Pascal deteriorates over the remainder of the Film. They argue frequently and both become romantically involved with third parties.

The climax of the Film occurs at a diving competition in Guadeloupe in 2017, where Roxana will attempt a new world record no limit freedive of 180 meters. After a teammate checks Roxana's dive equipment, Pascal is shown hunched over the air tanks, doing something with his left arm. When he is confronted, he confirms he was checking the tanks; the team lowers Roxana's equipment into the water.

Roxana successfully dives to the target depth of 180 meters, but when she tries to ascend, the lift bag will not inflate to return the sled to the surface. Roxana loses consciousness and releases the sled, which ascends without her. Roxana's body is retrieved and brought to the surface after more than eight minutes. The team's attempts to resuscitate her are unsuccessful, and she dies.

When a dive team member is questioned by the police about the incident, he tells them the air tank was "full and functional." An officer asks him, "What do you think happened to all that air?" He does not respond, and his face is replaced on screen by Pascal's; Pascal also remains silent.

Before the closing credits, an in memoriam page appears with a photograph of Mestre, stating: "In memory of Audrey Mestre, 1974–2002. Audrey tragically died on October 12, 2002 in the Dominican Republic while attempting to beat the world record at 171 meters." (Capitalization omitted.) Immediately afterward,

another message appears stating "This film remains a work of fiction. Any resemblance to reality is purely coincidental."

## II. The Complaint and Anti-SLAPP Motion

Ferreras filed his complaint for defamation and false light invasion of privacy on April 21, 2023, against the Netflix Defendants, Nolita Cinema,[4] and a number of Does. He claimed the Film was "a thinly disguised portrayal of Ferreras and [Mestre] and the events leading to [Mestre's] death." To that end, he alleged a list of similarities between Ferreras and the character Pascal, between Mestre and the character Roxana, and between the circumstances surrounding Mestre's and Roxana's deaths. Moreover, Ferreras claimed the Film defamed him by "falsely stat[ing] or impl[ying] that [he] intentionally caused his wife's death."

The Netflix Defendants moved to strike the complaint pursuant to the anti-SLAPP statute. (See § 425.16; *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055 (*Rusheen*) [defining anti-SLAPP].) They argued Ferreras's claims arose from their protected activity of creating and distributing the Film, and Ferreras could not demonstrate the requisite probability he would prevail. Among other things, they argued no reasonable viewer of the Film could understand it as conveying actual facts about Ferreras.

Ferreras moved to conduct limited discovery pertaining to the actual malice element of his defamation cause of action in order to oppose the anti-SLAPP motion. The Netflix Defendants opposed on the ground Ferreras had no good cause for discovery because he could not make out the other elements of defamation.

---

[4]     Ferreras later dismissed Nolita Cinema with prejudice.

5

On February 21, 2024, the trial court denied Ferreras's discovery motion. It determined Ferreras had not made a prima facie showing the Film "made a provably false statement of fact about him." That is, the court concluded Ferreras failed to show "a reasonable person would understand that the fictional character of [Pascal] was in fact [Ferreras] acting as depicted." For that reason, even assuming the Film implied Pascal killed Roxana, the Film did not make "a provably false factual assertion that Plaintiff Ferreras murdered his wife." Because Ferreras did not make out those elements of his defamation cause of action, he did not show good cause for discovery regarding actual malice.

Ferreras later filed his opposition to the Netflix Defendants' anti-SLAPP motion, and he acknowledged the trial court's February 21, 2024, order "went to the heart of [his] two critical dispositive assertions on the underlying merits of the suit," including that "reasonable viewers of the Film would have understood that it was intended to depict Ferreras and [Mestre]." Ferreras's motion further recognized if the court's conclusion that the Film is "a pure work of fiction" were left standing, his lawsuit was "dead on arrival." Thus, Ferreras's opposition brief sought to convince the trial court to reconsider that conclusion.

Ferreras submitted evidence in support of his opposition, including: (1) WhatsApp messages between Ferreras and the actor who played Pascal; (2) Instagram messages received by Ferreras after the Film's release; and (3) declarations of two Film viewers, Jorge Hazoury and Magali Lebel. The Netflix Defendants objected to the evidence on several grounds. The trial court ultimately excluded it as irrelevant.

The trial court then granted the Netflix Defendants' anti-SLAPP motion. First, the court agreed with the parties that the

6

Netflix Defendants had met their burden to show Ferreras's claims arose from their protected activity. Second, it reiterated its earlier conclusion Ferreras "had not demonstrated that the Film made provable false statements about [him]," and Ferreras's opposition to the anti-SLAPP motion was "no more persuasive than [its] motion seeking leave for limited discovery" because "no reasonable viewer would find that the Film portrayed [Ferreras]." The similarities between his life and Pascal's were "generic" and "largely inconsequential," and "the Film does not mention [Ferreras] by name or identify any other real life individuals that could tie [Ferreras] to [Pascal]." Thus, the trial court concluded Ferreras had "not shown . . . a reasonable person would understand that the fictional character of [Pascal] was in fact [Ferreras] acting as depicted," which was fatal to his defamation claim. The trial court also determined the Film did not make "a provably false factual assertion that [Ferreras] murdered his wife," and Ferreras failed to show actual malice by the Netflix Defendants.

## III.   Versus Is Named as a Defendant and Moves to Quash Service

While the Netflix Defendants' anti-SLAPP motion was pending, Ferreras amended his complaint to add Versus as a defendant. On February 20, 2024, Versus specially appeared to file a motion to quash for lack of personal jurisdiction. It argued that as a Belgian company with no employees or offices in California, it was not subject to general or specific personal jurisdiction in California. Ferreras opposed, arguing the trial court had specific personal jurisdiction over Versus because Versus had entered into a contract (the License Agreement) with Netflix, a California company, to distribute the Film.

7

The trial court concluded it lacked personal jurisdiction over Versus. First, it decided the License Agreement was not sufficient to show Versus had purposefully availed itself of the California forum in the circumstances of this case, which arose from a tort claim. Second, it decided this tort lawsuit did not arise out of or relate to Versus's contacts with California–which were limited to the License Agreement with Netflix. The trial court therefore granted Versus's motion to quash.

## IV. Ferreras's Appeal

On April 15, 2024, Versus and the Netflix Defendants served a notice of entry of the order granting both the anti-SLAPP motion and the motion to quash. Ferreras timely appealed. (See § 904.1, subd. (a)(3), (13); Cal. Rules of Court, rule 8.104(a)(1)(B).)

## DISCUSSION

## I. The Trial Court Did Not Err in Granting the Anti-SLAPP Motion

The trial court granted the anti-SLAPP motion because it determined Ferreras's claims arose from protected activity and he failed to demonstrate a probability of prevailing upon them. Ferreras argues that was error because his claims had sufficient merit. We disagree.

### A. Standard of Review and General Principles of Anti-SLAPP Law

"We review a trial court's ruling on a special motion to strike under section 425.16 de novo." (*Zhang v. Jenevein* (2019) 31 Cal.App.5th 585, 592.)

The anti-SLAPP statute "provides a procedure for weeding out, at an early stage, meritless claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384, italics omitted (*Baral*); see also § 425.16, subd. (b)(1).) A court's analysis

8

of an anti-SLAPP motion proceeds in two steps. (*Baral*, at p. 384.) "First, the defendant must establish that the challenged claim arises from activity protected by section 425.16."[5] (*Ibid.*)

If the defendant succeeds in that first step, "the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral*, *supra*, 1 Cal.5th at p. 384; see also *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 61.) At that step, a court undertakes "a 'summary-judgment-like procedure' " in which "[i]ts inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." (*Baral*, at pp. 384–385.) The plaintiff's evidence is accepted as true. (*Id.* at p. 385; see *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.) "However, speculative inferences not supported by the evidence proffered need not be considered." (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 795 (*Monster*).)

## B. A Defamation Plaintiff Is Constitutionally Required to Show the Allegedly Defamatory Statements Were "Of and Concerning" Him

Like the parties, we focus on Ferreras's defamation cause of action, which is also dispositive of his false light cause of action. (See *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1264 (*Jackson*).) "The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720; see also Civ. Code, § 44.)

---

[5] Ferreras does not challenge the trial court's determination that his claims arise from protected activity.

" 'The *sine qua non* of recovery for defamation . . . is the existence of a falsehood.' " (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 259.)

For a statement to be actionable, it must be a "statement of fact," not "a constitutionally protected statement of opinion." (*Brodeur v. Atlas Entertainment, Inc.* (2016) 248 Cal.App.4th 665, 680; see also *Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 701.) " '[E]ntertainment is entitled to the same constitutional protection as the exposition of ideas.' " (*Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 398; see also *Kirby v. Sega of America, Inc.* (2006) 144 Cal.App.4th 47, 58 [First Amendment "extend[s] to all forms of expression, including written and spoken words (fact or fiction), music, films, paintings, . . . entertainment," and video games].)

When the plaintiff is a public figure, he must also " 'show, by clear and convincing evidence, that the defamatory statement was made with actual malice–that is, with knowledge that it was false or with reckless disregard of whether it was false.' " (*Sanchez v. Bezos* (2022) 80 Cal.App.5th 750, 763, fn. 4 (*Sanchez*).)

In addition to those requirements, any plaintiff bringing an injurious falsehood claim–including defamation–is constitutionally required to show "the statement on which the claim is based . . . specifically refer[s] to, or [is] 'of and concerning,' [him] in some way." (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042 (*Blatty*); see also *Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 292, 293 (*Hartford*).) That is, the plaintiff must be "identified . . . expressly or by clear implication." (*Blatty*, at p. 1044; see also *Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1404 [libel].)

This appeal crucially turns on that "of and concerning" requirement.

"Whether defamatory statements can reasonably be interpreted as referring to plaintiff[] is a question of law for the court." (*Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 146 (*Tamkin*).) In resolving that question, we "consider the totality of the circumstances," which includes "the 'nature and full content of the communication . . . .' " (*Dickinson v. Cosby* (2019) 37 Cal.App.5th 1138, 1160 (*Dickinson*); see also *Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1338 [" 'Defamation actions cannot be based on snippets taken out of context.' "].)

Ferreras concedes he is not named in the Film, and he does not argue he is expressly identified therein. The United States and California Constitutions thus require he show he is identified by "clear implication" (*Blatty*, *supra*, 42 Cal.3d at p. 1044) or, put another way, by "reasonable implication" (*id.* at p. 1046). Our Supreme Court explained what that means in the context of a product disparagement claim, which is a species of injurious falsehood. (*Hartford*, *supra*, 59 Cal.4th at pp. 292–294.) "Disparagement by 'reasonable implication' [citations] requires more than a statement that may conceivably or plausibly be construed as derogatory to a specific product." (*Id.* at p. 295.) Rather, "[a] 'reasonable implication' . . . means a clear or necessary inference." (*Ibid.*)[6]

---

[6]     Ferreras's reply brief takes issue with requiring him to demonstrate a " 'clear implication' " instead of a " 'reasonable implication.' " As explained above, that is a distinction without a difference.

11

We find that explanation helpful when considering the required showing here. It is not enough for Ferreras to show the Film " 'may conceivably or plausibly be construed as' " referring to him; instead, he must show it refers to him by " 'a clear or necessary inference.' " (*Hartford*, *supra*, 59 Cal.4th at p. 295.)

In the specific context of a defamation cause of action premised upon a work of fiction, fellow Courts of Appeal have developed a test for the "of and concerning" concept. "In actions based on the identification of a fictional character with the actual plaintiff, '[t]he test is whether a reasonable person . . . would understand that the fictional character therein pictured was, in actual fact, the plaintiff acting as described.' " (*Tamkin*, *supra*, 193 Cal.App.4th at p. 146; see also *Aguilar v. Universal City Studios, Inc.* (1985) 174 Cal.App.3d 384, 387 (*Aguilar*).)

## C.      Ferreras Did Not Show the Film Is a Docudrama Purporting to Describe Historical Events or Real People

Ferreras's opening brief largely ignores the "of and concerning" test for fictional works and basically proceeds on the assumption the Film is not fiction. Ferreras repeatedly refers to the Film as "a docudrama," which he defines (without citation) as a "dramatization[] based on real events." A "docudrama" is essentially "historical fiction" (*Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 513) or "a 'dramatized retelling of history.' " (*De Havilland v. FX Networks, LLC* (2018) 21 Cal.App.5th 845, 852; see also Merriam-Webster Unabridged Dict. (Online 2025) <https://unabridged.merriam-webster.com/unabridged/docudrama> [as of Aug. 22, 2025] archived at <https://perma.cc/C2BE-9UU5> ["docudrama *noun*: [¶] a drama made for . . . motion pictures . . . dealing freely with

historical events"].) A common feature of the docudrama genre is its fictionalized portrayal of real people as characters. (See, e.g., *De Havilland, supra,* at p. 851 ["docudrama [*Feud: Bette and Joan* (FX 2017)] portrays the rivalry between actresses Joan Crawford and Bette Davis"].)

Of course, if a docudrama character shares the name of a real plaintiff who participated in the historical events depicted therein, the " 'of and concerning' " element of defamation could be easily satisfied: the plaintiff is "identified . . . expressly" in the work. (*Blatty, supra,* 42 Cal.3d at p. 1044.) Many of the cases relied upon by Ferreras arise in just that context, and thus do not analyze the " 'of and concerning' " element at any length. (See *Partington v. Bugliosi* (9th Cir. 1995) 56 F.3d 1147, 1149–1150; *Gaprindashvili v. Netflix*, Inc. (C.D.Cal. Jan. 27, 2022, No. 2:21-cv-07408-VAP-SKx) 2022 WL 363537, at p. *6 (*Gaprindashvili*); *Fairstein v. Netflix, Inc.* (S.D.N.Y. 2021) 553 F.Supp.3d 48, 59 (*Fairstein*); cf. *Aguilar, supra,* 174 Cal.App.3d at pp. 386–387 [film was not "of and concerning" the plaintiff, even though she shared a first name with one character].) Because Ferreras has already conceded he is not named in the Film, those cases are not helpful to show the Film is "of and concerning" him.

Ferreras does not explain the basis for his assumption the Film is a docudrama, nor is it apparent to us from the record. The complaint does not make that allegation and instead alleges "[t]he Film seeks to present itself as a fictional work." Moreover, the evidence supports the conclusion the Film is presented as fiction and does not purport to describe any historical events or real people, let alone Ferreras. Netflix promoted it as a " 'romantic drama.' " The Film told its audience it was "inspired by real events," and "remains a work of fiction." It also informed them

13

"any resemblance to reality is purely coincidental." Rosenthal stated the Film "is a work of fiction." Ferreras has not identified any characters whose names are the same as any real individuals, let alone his own name.[7] He neither claims he attended the 2016 and 2017 diving competitions and events depicted in the Film, nor asserts the Film depicts actual incidents occurring at those historical events or competitions. Indeed, Mestre's tragic death in 2002 occurred approximately 13 to 14 years before the events depicted in the Film, which were set in 2016 and 2017.

Ferreras seems to argue that two statements at the beginning and end of the Film essentially transformed it into a docudrama "of and concerning" him. Those are: (1) "inspired by real events," which appears after the opening credits; and (2) "In Memory of Audrey Mestre, 1974–2002," appearing before the closing credits. Neither shows the Film is a docudrama "of and concerning" Ferreras.

First, we reject Ferreras's contention that "inspired by real events" means "viewers [were] told . . . the Film is based on fact and is not entirely fictional." The statement speaks for itself: it says "inspired by," not "based on." Merriam-Webster provides multiple definitions of "inspire," including "to have an animating, enlivening, or exalting effect upon." (Merriam-Webster Unabridged Dict. (Online 2025) <https://unabridged.merriam-webster.com/unabridged/inspire> [as of Aug. 22, 2025] archived at <https://perma.cc/PSA5-6HBE>.) Ferreras has cited no authority indicating "inspired by" actually means "based on."

---

[7]    In fact, the lead male character's name, Pascal Gautier, shares the last name of a different freediver, Julie Gautier, by whom Rosenthal claimed to have also been inspired.

14

Second, Ferreras argues "[t]he only logical reason for the film makers to have included the In Memoriam Page . . . was to create a connection in the minds of viewers . . . between the Film and the actual events leading to [Mestre's] death." (Underscoring omitted.) But Ferreras points to no evidence suggesting that was the motivation to include the in memoriam page. On the contrary, the evidence submitted was that Rosenthal included it "to honor [Mestre's] life, given the impact she left on the free-diving world and her story's personal impact on [him]." Ferreras has cited no authority suggesting the presence of an in memoriam page indicates a fictional work is actually a docudrama. Nor is it otherwise apparent to us. We decline to credit Ferreras's speculative inferences from those two statements, which have no support in this record. (See *Monster*, *supra*, 7 Cal.5th at p. 795.)

Finally, Ferreras argues the two statements amount to "self-serving disclaimers" courts have routinely rejected. But many of the cases he relies upon do not analyze disclaimers in the context of whether a particular work is "of and concerning" the plaintiff, which is the issue we are concerned with here. Instead, they consider disclaimers in the context of whether the work "present[s] a statement of fact that is provably false." (*Gaprindashvili*, *supra*, 2022 WL 363537, at pp. *5–*6; *Fairstein*, *supra*, 553 F.Supp.3d at pp. 60, 63–82.) Those cases do not discuss the "of and concerning" element, presumably because the plaintiffs were "identified . . . expressly" in the works at issue. (*Blatty*, *supra*, 42 Cal.3d at p. 1044.) When a work expressly identifies a specific person by name, a disclaimer may have a very different impact than when it is presented as a work of fiction. But as we have already explained and Ferreras has conceded, he was not expressly identified in the Film.

Ferreras's repeated assertion the use of disclaimers and fictitious names does not necessarily insulate a defendant from defamation liability misses the point. While disclaimers and fictitious names may not be dispositive, they are part of the totality of the circumstances we consider. (See *Dickinson*, *supra*, 37 Cal.App.5th at p. 1160.) Thus, we cannot and do not ignore the Film's disclaimers, fictitious names, and other elements in considering whether the Film refers to Ferreras by a clear or necessary inference.

### D. Ferreras Did Not Show a Reasonable Viewer Would Understand the Fictional Pascal Was Actually Him

Because Ferreras did not show the Film is a docudrama depicting real people or historical events, we apply the "of and concerning" test used by our fellow Courts of Appeal in cases where the plaintiff claims he is defamed by a fictional character: " 'whether a reasonable person . . . would understand that the fictional character therein pictured was, in actual fact, the plaintiff acting as described.' " (See *Tamkin*, *supra*, 193 Cal.App.4th at p. 146; see also *Aguilar*, *supra*, 174 Cal.App.3d at p. 387.)

*Tamkin* is the seminal case in this area. In that case, married real estate agent plaintiffs Scott and Melinda Tamkin failed to show a probability of prevailing on their defamation claims arising from an episode of the popular television program, *CSI: Crime Scene Investigation* (KCBS-TV broadcast, Feb.12, 2009), set in Las Vegas, Nevada. (*Tamkin*, *supra*, 193 Cal.App.4th at pp. 137, 146.) The Tamkins had been involved in a failed real estate transaction in Los Angeles with one of the writers of the *CSI* program, who later used their names for characters in preliminary drafts of a *CSI* episode; their names were also used in casting

synopses to recruit actors, but the characters' names were eventually changed to Scott and Melinda Tucker in the broadcast episode. (*Id.* at pp. 137–138.)

The *Tamkin* court determined that despite the identical name, similar occupation (real estate business), age (late 30's), physical characteristics (attractive), and a wife with the same name (Melinda Tamkin), a reasonable person would not conclude the casting synopsis referred to the real Scott Tamkin. (*Tamkin*, *supra*, 193 Cal.App.4th at pp. 137, 146–147.) The court explained there was nothing uniquely identifying in the character's physical description or otherwise, nor any biographical details (e.g., birthplace, parents, children, schooling) in common with the real Scott Tamkin. (*Id.* at pp. 137, 147.) In addition, no reasonable person who read the casting synopses and saw the broadcast would understand the fictional characters in the episode to be the real Tamkins, because the additional descriptive characteristics in the episode (such as Scott's use of high fluoride toothpaste) were not sufficiently unique, and the episode included other differences– such as being set in Las Vegas and the characters having no children. (*Id.* at pp. 137, 148.)

Considering the record as a whole and for the reasons we describe below, we conclude the trial court did not err in granting the anti-SLAPP motion because Ferreras failed to show a reasonable viewer " 'would understand that [Pascal] was, in actual fact, [Ferreras] acting as described.' " (*Tamkin*, *supra*, 193 Cal.App.4th at p. 146.)

17

1. **The Existence of Certain Similarities Between the Character Pascal and Ferreras Is Not Persuasive When the Film Is Viewed as a Whole**

In an effort to show reasonable viewers would understand Pascal was actually him, Ferreras relies upon a number of "similarities between the Film and the story of the death by drowning in 2002 of [Mestre], and of [their] life together." While that includes a long list of ostensible similarities between himself and Pascal, as the trial court determined, "many of the material overlaps between [Ferreras's] life and the Film's portray[al of] [Pascal] are limited to similarities that would be generic to any film about freediving." For example, the characters are elite competitive freedivers who are young, athletic, and attractive. But similar traits like age, physical characteristics, and occupational fields are not sufficient to show a reasonable person would believe a fictional character was actually the real plaintiff, even when they share the same name. (See *Tamkin*, *supra*, 193 Cal.App.4th at pp. 146–147; *Aguilar*, *supra*, 174 Cal.App.3d at pp. 387–391; see also *Polydoros v. Twentieth Century Fox Film Corp.* (1997) 67 Cal.App.4th 318, 321, 323 (*Polydoros*) ["similarit[ies] in names and attire, the enjoyment of baseball and swimming, and the brash nature of the . . . character" were only "rudimentary"].) Even more so here, since Ferreras is not named in the Film, the fact Ferreras is a freediver who shares a handful of generic similarities with the freediver character of Pascal that would be typical amongst freedivers—such as age, athleticism, and competing in diving events in locations around the Caribbean—falls short of creating a clear or necessary inference that Pascal is, in fact, Ferreras.

Moreover, Ferreras essentially ignores the myriad differences between himself and the character Pascal, which are part of the totality of the circumstances we consider. (See *Dickinson*, *supra*, 37 Cal.App.5th at p. 1160.) Those include differences in national origin (Ferreras is Cuban, Pascal is French); residence (Ferreras met Mestre in Mexico and they lived together in Miami; Pascal and Roxana meet and live in Porquerolles, France); marital status (Ferreras was married three times, including to Mestre in 1999, Pascal was unmarried); time period and geographic setting (Ferreras's last record-breaking dive occurred in 2003 and Mestre died in the Dominican Republic in 2002, while the Film is set in Europe in 2016 and 2017 and Roxana dies in Guadeloupe in 2017). And in the Film, Pascal sets his last world record in August 2016, before Roxana begins her own freediving training. By contrast, Ferreras and Mestre were simultaneously elite freedivers for several years, even making a record-setting tandem dive together in 1998, and according to Ferreras, he continued diving and even set a record after Mestre's death.

Likewise, Ferreras's relationship with Mestre did not resemble the relationship between the characters of Pascal and Roxana in the Film. He and Mestre "were a happy couple who were very much in love." By contrast, the relationship between Pascal and Roxana is shown as "deeply troubled," with tempestuous arguments and infidelity by each.

Those differences, combined with generic similarities shared by other freedivers and athletes, indicate no reasonable person would conclude Pascal was actually Ferreras, acting as described. (See *Tamkin*, *supra*, 193 Cal.App.4th at p. 148; see also *Polydoros*, *supra*, 67 Cal.App.4th at p. 323.)

19

As a fallback, Ferreras argues that even setting aside the generic similarities between himself and the character Pascal, there are several "*core* and indisputably *unique* similarities" that are nevertheless determinative: (1) he and Mestre were romantic partners and "co-world champions"; (2) Mestre pursued "break[ing] the world record once [Ferreras] was medically sidelined"; and (3) Mestre died "due to a bag not inflating while [Ferreras] was supervising the dive."[8] But those simply reinforce what the Netflix Defendants have already admitted: Ferreras and Mestre—along with other freedivers, athletes, and various sources—inspired the Film. Rosenthal explained he drew inspiration from: (1) his own experiences with scuba diving and freediving; (2) films and books about freedivers, including a 1998 French movie about rival no limit freedivers and a diver's tortured relationship with his girlfriend that resulted in his death during a dive; (3) fictional stories about dangerous romantic entanglements; (4) the lives of top freedivers, including Ferreras and Mestre, as well as two other freediving couples; (5) "real-world couples who are also world-class athletes"; and (6) "numerous couples from the entertainment industry" who have "toxic and destructive relationships." That certain aspects of Ferreras's life may have partially inspired the Film does not show a reasonable person would understand Pascal was actually Ferreras, acting as described. (See *Khodorkovskaya v. Gay* (D.C.Cir. 2021) 5 F.4th 80, 85 ["[A] fictional play, even if

---

[8] We question those ostensible similarities because: (1) Roxana's character was never a "co-world champion[]" with Pascal; and (2) according to Ferreras, his medical condition did not end his competitive diving career, because he set a record in 2003 (after Mestre's death). By contrast, Pascal's last competitive dive in the Film occurs before his doctor advised him to stop.

20

inspired by historical events, by definition is not—and does not purport to be—a historical documentary . . . ."].)

## 2.    *Bindrim* Is Not Persuasive

Ferreras's reliance on *Bindrim v. Mitchell* (1979) 92 Cal.App.3d 61(*Bindrim*), disapproved on other grounds by *McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835, 846, footnote 9, is misplaced. In that case, a jury found an author liable for libel for her portrayal of the plaintiff in a novel as the character Herford. (*Id.* at p. 68.) Plaintiff "used the so-called 'Nude Marathon' in group therapy," which the author attended, and her novel depicted " 'Dr. Simon Herford' " leading "a nude encounter session." (*Id.* at pp. 69, 70.) In that case, "the *only* differences between plaintiff and the Herford character . . . were physical appearance and that Herford was a psychiatrist rather than a psychologist." (*Id.* at p. 75, italics added.) Moreover, "the similarities between Herford and [plaintiff] [were] clear, and the transcripts of the actual encounter weekend show a close parallel between the narrative of [the] novel and the actual real life events." (*Id.* at p. 76.) The court therefore concluded "[t]here [was] overwhelming evidence that plaintiff and 'Herford' were one." (*Ibid.*; see also *Tamkin, supra*, 193 Cal.App.4th at p. 146.)

*Bindrim* is inapposite here for multiple reasons. First, we have already explained the numerous differences between the character Pascal and Ferreras, which are more extensive and substantial than the mere differences in physical appearance and professional credentials identified in *Bindrim*. Second, the similarities between Pascal and Ferreras are largely generic and common to many other elite divers and athletes. Third, there is no evidence the Film's screenplay closely parallels any real transcripts or dialogue from historical events in Ferreras's life.

21

Moreover, the jury in *Bindrim* had evidence before it that after the author signed a publishing contract for the novel, she told someone "she was worried because she had signed a contract and painted a devastating portrait of [the plaintiff]." (*Bindrim*, *supra*, 92 Cal.App.3d at p. 69.) Similar incriminating evidence from a work's creator connecting a character to the real-life plaintiff was present in other cases upon which Ferreras relies. (See *Fetler v. Houghton Mifflin Co.* (2d Cir. 1966) 364 F.2d 650, 651 [the novel's author told the plaintiff "the book . . . 'was about our father, the family concerts and me' "]; *Harvey v. Netflix* (C.D.Cal. Sept. 27, 2024, No. 2:24-cv-04744-RGK (AJRx)) 2024 WL 4536639, *1–*2, *6, appeal filed (9th Cir. Oct. 9, 2024, No. 24-6151) [writer and star "stated that he 'disguised' his real stalker [e.g., the plaintiff] as Martha in the [s]eries"].) But there is no evidence like that here. On the contrary, Rosenthal has categorically denied the Film depicts Ferreras (or Mestre).

### 3. The Totality of the Circumstances Shows No Reasonable Person Would Understand Pascal to Actually Be Ferreras

Considering the entire context of the Film and all the evidence in the light most favorable to Ferreras, the handful of similarities between him and Pascal does not provide a "clear or necessary inference" the Film refers to him. (See *Hartford*, *supra*, 59 Cal.4th at p. 295.) On this record, no reasonable person would understand Pascal was actually Ferreras, acting as described. (See *Tamkin*, *supra*, 193 Cal.App.4th at p. 146.) In fact, a person could conclude as much only by disregarding the Film's express statements that it was a work of fiction, inspired by real events, where "any resemblance to reality [was] purely coincidental." Ferreras has not shown a reasonable viewer would do so.

22

Because "[t]here is no law providing relief for defamation by a fictional work which does not portray the plaintiff at all," Ferreras cannot show a probability of prevailing on his claims. (*Polydoros*, *supra*, 67 Cal.App.4th at p. 326; see *Jackson*, *supra*, 10 Cal.App.5th at p. 1264 [defamation is dispositive of false light claim].) The trial court properly granted the Netflix Defendants' anti-SLAPP motion.

### E.    We Need Not Address Several of Ferreras's Other Arguments

In light of our conclusion the Film is not "of and concerning" Ferreras, we need not consider whether the alleged defamatory statement in the Film was an actionable false statement or whether Ferreras showed the Netflix Defendants acted with actual malice. (See *Sanchez*, *supra*, 80 Cal.App.5th at p. 763, fn. 4.) And because Ferreras failed to make a prima facie showing on his defamation claim, the trial court properly denied his motion for discovery regarding actual malice. (See *John Doe 2 v. Superior Court* (2016) 1 Cal.App.5th 1300, 1311–1312.)

## II.    The Trial Court Did Not Abuse Its Discretion in Sustaining the Netflix Defendants' Objections to Certain Evidence Offered by Ferreras

When it decided the anti-SLAPP motion, the trial court also sustained the Netflix Defendants' objections to several pieces of evidence proffered by Ferreras: (1) WhatsApp messages between Ferreras and the actor who played Pascal; (2) Instagram messages received by Ferreras; and (3) declarations of Film viewers Hazoury and Lebel. Ferreras argues the trial court should not have excluded the Instagram messages and the Hazoury and Lebel declarations because they were relevant to how actual viewers would interpret the Film, and thus relevant to whether a

23

reasonable viewer would believe Pascal was Ferreras, acting as described. Solely for purposes of this opinion, we assume Ferreras is correct that evidence from "real-world" viewers could amount to some evidence a reasonable person would understand the character Pascal was actually Ferreras.**9** (Cf. *Aguilar*, *supra*, 174 Cal.App.3d at p. 391 [identification must be reasonable].)

"We review the trial court's evidentiary rulings for abuse of discretion." (*Sanchez*, *supra*, 80 Cal.App.5th at p. 763.) Under that standard, "as long as there exists 'a reasonable or even fairly debatable justification . . . for the [trial court's decision], such action will not be here set aside.' " (*Gonzales v. Nork* (1978) 20 Cal.3d 500, 507; see also *People v. Williams* (2013) 58 Cal.4th 197, 270–271 [an abuse of discretion is " ' "arbitrary, capricious or patently absurd" ' "].) There was no abuse of discretion here.

As to the Instagram messages, Ferreras submitted no evidence indicating the individuals who sent them had even seen the Film. Thus, the trial court properly determined their messages were irrelevant.

---

**9**     We are not convinced that is the rule in California. Ferreras cites three federal district court cases in support of that notion, one of which discusses the issue in the context of whether the statement had a defamatory meaning, and the other two do not apply California law. (See *Gaprindashvili*, *supra*, 2022 WL 363537, at p. *7 [not addressing the "of and concerning" requirement]; *Vazquez v. Whole Foods Market, Inc.* (D.D.C. 2018) 302 F.Supp.3d 36, 62, 64 [District of Columbia law]; *Tah v. Global Witness Publishing, Inc.* (D.D.C. 2019) 413 F.Supp.3d 1, 7–8, 11–12 [same].)

Likewise, the trial court did not abuse its discretion in excluding the declarations from Hazoury and Lebel. Hazoury is "developing a documentary on the sport of freediving and [Ferreras's] life . . . for years, in close collaboration with him." Lebel is a cousin of Mestre. Both Hazoury and Lebel were given a "list of similarities between the Film . . . and the real life story of [Ferreras] and [Mestre]" by Ferreras's counsel. Both also "watched the film . . . and formed the strong opinion that it was the story of [Ferreras] and [Mestre]." Neither declaration indicates if Hazoury or Lebel viewed the Film before or after receiving the list from Ferreras's counsel. Two viewers acquainted with the Film's ostensible subjects, who received a list of similarities between the Film and Ferreras's life from Ferreras's counsel, are not "real-world viewers" whose impressions could meaningfully bear upon whether the Film is "of and concerning" Ferreras. (See *Aguilar*, *supra*, 174 Cal.App.3d at p. 391.) The trial court did not abuse its discretion in excluding their declarations.

## III. The Trial Court Did Not Err in Granting the Motion to Quash

The trial court concluded it lacked specific personal jurisdiction over Versus because Ferreras did not show Versus purposefully availed itself of the benefits of the California forum or that its action arose out of Versus's California contacts. We agree Ferreras failed to carry his burden to show the exercise of jurisdiction was appropriate.

### A. Standard of Review

Where, as here, the facts in the record regarding jurisdiction are not conflicting, " ' "the question of jurisdiction is purely one of law and [we] engage[] in an independent review of the record." ' " (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054,

25

1062 (*Snowney*); see also *Rivelli v. Hemm* (2021) 67 Cal.App.5th 380, 393 (*Rivelli*).)

### B.     Principles of Personal Jurisdiction

"California courts may exercise personal jurisdiction on any basis consistent with the Constitutions of California and the United States." (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 268 (*Pavlovich*), abrogated on another ground as stated in *David L. v. Superior Court* (2018) 29 Cal.App.5th 359, 369–370, 373; see also § 410.10.) We are particularly cautious when considering the exercise of jurisdiction over a company from outside the United States. (*Rivelli, supra*, 67 Cal.App.5th at p. 393.)

Whether a state's courts may exercise jurisdiction over a defendant depends upon "the nature and extent of 'the defendant's relationship to the forum State.' " (*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court* (2021) 592 U.S. 351, 358 (*Ford Motor*).) In that regard, there are "two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." (*Ibid.*; see also *Pavlovich, supra*, 29 Cal.4th at pp. 268–269.) The parties agree only specific jurisdiction is at issue here.

Specific jurisdiction "covers defendants less intimately connected with a State" than those over whom the State has general jurisdiction, "but only as to a narrower class of claims." (*Ford Motor, supra*, 592 U.S. at p. 359.) "A court may exercise specific jurisdiction over a nonresident defendant only if: (1) 'the defendant has purposefully availed himself or herself of forum benefits' [citation]; (2) 'the "controversy is related to or 'arises out of' [the] defendant's contact with the forum" ' [citations]; and (3) ' "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " ' " (*Pavlovich, supra*, 29 Cal.4th at

p. 269.) " '[T]he plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction.' " (*Snowney, supra*, 35 Cal.4th at p. 1062.) Because Ferreras failed to show his action against Versus is related to or arises out of Versus's contacts with California, we conclude the trial court properly declined to exercise jurisdiction over Versus.[10]

## C. Ferreras Failed to Show His Claims Arise Out of or Relate to Versus's Contacts in California

Ferreras argues his lawsuit is " 'related to' Versus' act of entering into the License Agreement" with Netflix because "the lawsuit concerns defamatory content" in the Film, and Versus entered the License Agreement so Netflix would distribute the Film in California and elsewhere. We are not persuaded his claims against Versus arise out of or relate to the License Agreement.

For a state to exercise specific personal jurisdiction over a defendant, there must be "a connection between the forum and the specific claims at issue." (*Bristol-Myers Squibb Co. v. Superior Court* (2017) 582 U.S. 255, 265 (*Bristol-Myers*); *Jayone Foods, supra*, 31 Cal.App.5th at p. 562, quoting *Bristol-Myers*, at p. 265.) However, "a strict causal relationship between the defendant's in-state activity and the litigation" is not required. (*Ford Motor, supra*, 592 U.S. at p. 362; see *Jayone Foods, supra,* at p. 561.)

In evaluating whether there is a connection between the claim and the forum, we examine the defendant's " '*relevant*

---

**10** For purposes of this opinion, we assume without deciding Ferreras satisfied the first element of the specific jurisdiction test by showing Versus purposefully availed itself of the California forum when it entered into the License Agreement with Netflix, a California company. (See *Jayone Foods, Inc. v. Aekyung Industrial Co. Ltd.* (2019) 31 Cal.App.5th 543, 558 (*Jayone Foods*).)

27

conduct' " and where it occurred. (*Bristol-Myers*, *supra*, 582 U.S. at p. 265; *Walden v. Fiore* (2014) 571 U.S. 277, 285 (*Walden*) ["[I]t is the defendant's conduct that must form the necessary connection with the forum State"].) If "all the conduct giving rise to the [plaintiffs'] claims occurred elsewhere," courts of that state "cannot claim specific jurisdiction." (*Bristol-Myers*, *supra,* at p. 265; see also *Walden*, *supra,* at p. 291.)

Here, the paucity of the complaint's allegations against Versus seriously handicap Ferreras's attempts to demonstrate this element. When Ferreras amended his complaint to substitute Versus's name for "Doe 1," he simply added Versus to a paragraph alleging "that each of the fictitiously named defendants engaged in, or is in some manner responsible for, the wrongful conduct alleged herein." The complaint (as amended) scarcely mentions Versus, let alone describes the conduct Versus allegedly engaged in to defame Ferreras or where that conduct supposedly occurred. (Cf. *Rivelli*, *supra*, 67 Cal.App.5th at pp. 400–402 [analyzing the specific misconduct alleged for each cause of action and its relation to the forum].)

In connection with his opposition to Versus's motion to quash, Ferreras relied upon the License Agreement between Netflix and Versus. The License Agreement indicates Versus agreed to produce and complete the Film, subject to certain specifications by Netflix, which would in turn license the Film and distribute it worldwide. Even if that means Versus, as the Film producer, had some role in creating the allegedly defamatory statement in the Film, nothing in the License Agreement suggests any of Versus's conduct took place *in California*. And the record indicates "Versus did not provide any services in connection with [the Film] within the State of California." It has "its only

28

two offices in . . . Belgium," and "does not now maintain, and has never maintained, an office or any employees within the United States, including within the state of California." Thus, " ' "the operative facts of the controversy [e.g., the defamation] are not related to [Versus's] contact with [California]." ' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 455.)

Ferreras argues that because Versus contracted with Netflix to distribute the Film, and because "the lawsuit concerns defamatory content in the very same Film," the lawsuit is related to the License Agreement. But the License Agreement provides Netflix had "the right and license to copy, reproduce, transmit, exhibit, distribute, sublicense, and communicate to the public the Titles [including the Film] within the Territory . . . in any and all formats and versions." "Territory" was defined as "The Universe." (Underscoring omitted.) The License Agreement does not indicate Versus had any role in disseminating or distributing the Film, in California or anywhere else. Netflix did. But a California court cannot exercise personal jurisdiction over Versus based on *Netflix's* conduct, particularly where it was neither "alleged that [Versus] engaged in relevant acts together with [Netflix] in California," nor "that [Versus] is derivatively liable for [Netflix's] conduct in California." (*Bristol-Myers*, *supra*, 582 U.S. at p. 268; see also *Walden*, *supra*, 571 U.S. at p. 286 ["a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction"].) "The bare fact that [a foreign defendant] contracted with a California distributor is not enough to establish personal jurisdiction . . . ." (*Bristol-Myers*, *supra,* at p. 268; see also *Walden*, *supra,* at p. 286 ["Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State."].)

29

And even if Ferreras is correct the License Agreement shows Versus has some affiliation with California, that affiliation is based *in contract*. (See *Rivelli*, *supra*, 67 Cal.App.5th at p. 404.) It therefore does not help Ferreras, whose claims against Versus sound *in tort* and "do not arise from, or relate to the contractual relationship" between Netflix and Versus. (*Ibid.*) Ferreras's tort cause of action for defamation relates "to alleged misconduct that bears no particular affiliation to the forum" of California. (*Ibid.*) Moreover, this is not a case where a California plaintiff suffered harm in California. (Cf. *Jayone Foods*, *supra,* 31 Cal.App.5th at p. 563 [California residents alleged harm suffered in California from a product purchased in California].) The complaint does not allege Ferreras is a citizen or resident of California.

The trial court correctly determined it lacked specific personal jurisdiction over Versus.

## DISPOSITION

The orders are affirmed. Defendants are entitled to costs on appeal. (See Cal. Rules of Court, rule 8.278(a)(1)–(2).)


RICHARDSON, J.

WE CONCUR:


CHAVEZ, Acting P. J.


GOORVITCH, J.*

---

\*    Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.